97 537
133 274
134 548
97 537
40a 347
40a 358
97 537
154 336
154 468
97 537
46a 94
97 537
66a 330
66a 331
97 537
104a ¹ 24

## THE UNION MUTUAL LIFE INSURANCE COMPANY

### *v.*

## THE FREAR STONE MANUFACTURING COMPANY *et al.*

*Filed at Ottawa February 3, 1881—Rehearing denied March Term, 1881.*

1. CORPORATIONS—*capital stock a trust fund for creditors.* The capital stock of a corporation is a trust fund, that the directors may not give away or misappropriate to the prejudice of parties whom they have invited to deal with the corporation. The State grants the franchise on the understanding the corporation created will have a capital stock, which is usually fixed, which is for the security of all persons who deal with the corporation, as well as to afford the means to accomplish the objects of the incorporation.

2. SAME—*right of stockholders to limit their liability to creditors.* Where the charter has fixed the minimum amount of capital stock, the stockholders have no warrant for saying a less sum shall constitute the same, as it would abrogate, by private agreement, the provisions of their charter. Any device, by which the members of a corporation seek to avoid the liability which the law imposes upon them, is void as to creditors, whether binding or not as between themselves. Nor is it in the power of shareholders, by private agreement with the corporation, to make the shares of stock issued to them non-assessable, so as to excuse payment for such stock at its par value as against creditors.

3. Where a private corporation, organized under a special charter which did not make stockholders personally liable for the debts of the corporation, and its capital stock was fixed at $200,000, in shares of $100 each, by the charter, with the privilege of increasing the same to $1,000,000, and the stock was afterwards, by resolution, increased to $300,000, and various persons subscribed under a written agreement incorporated into the subscription paper, that no assessment should be made upon the stock of the company, and that each subscriber was to pay $10 upon each share of stock subscribed, as the sum total he was to pay, it was *held*, that while such contract might be binding between the corporation and the stockholders, it was invalid and void as against creditors of the corporation who had no notice of the same at the time of dealing with the corporation, as being against public policy and justice, and that such creditors could enforce payment of such stock to the extent of their demands against the corporation.

4. SAME—*contracts with stockholders—estoppel.* It is competent for a corporation to contract with its stockholders. A corporation has no existence apart from its officers conducting its affairs and who represent the shareholders. As between themselves, any contract fairly entered into would

seem to be valid. At all events a corporation will be estopped to say its contract is *ultra vires,* and to sue its stockholders upon obligations arising by implication of law, that it has once solemnly waived. But no such doctrine can be applied to creditors of a corporation.

5. SAME—*under charter before present constitution, not affected by, or the general law passed thereunder.* Where a charter of a private corporation was passed in 1867, before the adoption of the present constitution, and before the passage of the general Incorporation act, it was *held,* that such charter was not affected either by the constitution or the general law on the subject.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Circuit Court of Cook county; the Hon. WILLIAM H. BARNUM, Judge, presiding.

Messrs. McCLELLAN, TEWKSBURY & CUMMINS, for the appellant:

All the capital must be subscribed before a corporation is authorized to commence business. *Altman* v. *H. R. & E. R. R. Co.* 88 Ill. 525; *Littleton Mfg. Co.* v. *Parker,* 14 N. H. 543; *Salem Mill Dam Co.* v. *Ropes,* 9 Pick. 187; *P. & R. I. R. R. Co.* v. *Preston,* 35 Ia. 115; Green's Brice's Ultra Vires (2d ed.) 153, note a.

Commencing business with only one-fifteenth of capital subscribed, was held a fraud on creditors. *In re Imperial Steam Co.* v. *Household Coal Co.* 37 L. J. Ch. 517.

When the charter fixes the amount of capital stock, and the number of shares, the amount of capital can not be changed. *Chicago City Ry. Co.* v. *Alverton,* 18. Wall. 233.

The provisions in the charter of a corporation, fixing the amount of capital and number and value of shares, are a part of the fundamental law of corporate being, and any attempt to change them is void. Green's Brice's Ultra Vires (2d ed.) p. 159, note. Citing *Curran* v. *State of Arkansas,* 15 How. 305; *Wood* v. *Dummer,* 3 Mason, 308, and other cases.

Corporations have not impliedly the power to vary their capital, when the amount thereof has been fixed by charter. Green's Brice's Ultra Vires (2d ed.) p. 159; *Smith* v.

*Goldsworth,* 4 Q. B. 430, 12 L. J. (Q. B.) 192 ; *Droitwitch Pat. Salt Co.* v. *Curzon,* L. R., 3 Eq. 35.

A corporator can not, by any act alleged to operate by way of waiver or estoppel, release the corporation from its obligation to have the capital required by its charter. *Oldtown and Lincoln R. R. Co.* v. *Veazie,* 39 Me. 571.

That stockholders are privies of the corporation is well established. *Sawyer* v. *Hoag,* 17 Wall. 623.

The defendants are estopped from urging the illegality of their own acts as a defence. *McCarthy* v. *Lavasch,* 89 Ill. 270 ; *Dows* v. *Naper,* 91 id. 45 ; *Bradley* v. *Ballard,* 55 id. 513 ; *Slocum* v. *Providence Steam and Gas Pipe Co.* 10 R. I. 112 ; *Slocum* v. *Warren,* id. 116.

The stipulation in the subscription agreement, providing that the subscribers shall not be liable to pay more than \$10 on each share for which they subscribe, is a violation of the charter, and contrary to public policy, and is therefore void, and the agreement to take stock is not affected by it. *Sagory* v. *Dubois,* 3 Sandf. Ch. 491.

The capital stock and other property of a corporation is to be deemed a trust fund for the payment of the debts of the corporation. Thompson's Stockholders' Liability, sec. 10, and cases cited ; *Sanger* v. *Upton,* 1 Otto, 60 ; *Upton* v. *Tribilcock,* id. 47.

The acceptance and holding of a certificate of stock implies a promise on the part of the holder to pay for it. *Upton* v. *Tribilcock,* 1 Otto, 47 ; *Sanger* v. *Upton,* id. 63 ; *Kline* v. *Alton R. R. Co.* 13 Ill. 514 ; *Barret* v. *Alton R. R. Co.* id. 505 ; *Bingham* v. *Mead,* 10 Allen, 245 ; *Spear* v. *Crawford,* 14 Wend. 20 ; *Hartford and New Haven R. R. Co.* v. *Kennedy,* 12 Conn. 499 ; *Ellis* v. *Schmœck et al.* 5 Bing. 521 ; *Doubleday* v. *Musket et al.* 7 id. 110 ; *Harvey et al.* v. *Kay,* 9 Barn. & Cres. 356.

Mr. JOSEPH E. SMITH, for appellee Caroline F. Milne, executrix, etc.:

The brief submitted for appellant may be reduced to two propositions:

1. The contract of the stockholders with the company, "that they subscribed to stock upon the sole condition that ten dollars was all they would pay, or should ever be called upon to pay," is void.

2. If void, the limitation of liability only is void, while the contract of subscription still remains valid and binding.

This may be true as to corporations formed under a law providing for personal liability of stockholders, as an attempt to evade the statute. In the absence of any such statutory liability, such a contract is valid between the corporation and stockholders, and there being no privity between the creditor and the stockholder in such corporations, the equity, if any, must be worked out through the corporation. In the absence of fraud, the creditor can not obtain greater rights and powers than the corporation itself has, against the stockholders.

That there is no liability at common law, of the stockholder to the creditor, see: *Gray* v. *Coffin*, 9 Cush. 192; *Shaw* v *Boylen*, 16 Ind. 384; *Trustees of Free Schools, etc.* v. *Flint*, 13 Met. 539; Abb. Dig. Corp. 379; Angell & Ames on Corp. § 605, 598.

There is no privity between the creditor and the stockholder. *Spear* v. *Grant*, 16 Mass. 9; *Gray* v. *Coffin*, 9 Cush. 199; Angell & Ames on Corp. secs. 602, 605; *Wood* v. *Dummer*, 3 Mason, 308.

In the absence of any statute making the stockholders liable to the corporation, the creditor, in order to enforce, in equity, his remedy against the stockholder, must first establish a contract on the part of the stockholder to pay the amount subscribed to the corporation, which the corporation itself could have enforced. *Buffalo & N. Y Central R. R. Co.* v. *Dudley*, 14 N. Y. 336; *Buff. City R. R. Co.* v. *Douglas*, 10 Allen, 245; 39 Me. 685; *Seymour* v. *Sturgess*, 26 N. Y.

134; *Huddersfield Canal Co.* v. *Buckley,* 7 T. R. 36; Angell & Ames on Corp. sec. 517 *et seq.*

The principle we seek to establish is, that a *bona fide* contract between a subscriber and a corporation, should protect him, and is sustained by very recent decisions of the English courts. New Rep. Scotch 'and Divorce Appeals, vol. II. p. 29; *Waterhouse* v. *Jamieson,* Law Rep. Ch. App. vol. II, 527; *In re Richmond Hotel Co.* and *Pellatt's case.*

Messrs. DEXTER, HERRICK & ALLEN, for the appellee Adams:

The right of the creditor to maintain such a bill is founded on the principle, that the assets of a corporation are a trust fund for the payment of its debts, and that the liability to pay for stock, once assumed, becomes an asset, which creditors may reach like any other asset of the corporation. *Ogilvie* v. *Knox Ins. Co.* 22 How. 387; Thompson's Liab. of Stockholders, secs. 14, 15.

In this case there was an express contract, in writing, between the parties, fixing the extent of the stockholders' liability, made after the corporation was fully organized.

That a stockholder will not be required to pay any more for his shares than his agreement with the corporation calls for, counsel cited many authorities, among which are: *Waterhouse* v. *Jamieson,* L. R., 2 Sc. & Div. Ap. cases, 29; *Carling's case,* L. R., 1 Ch. div. 115; *DeRuvigne's case,* L. R., 5 Ch. div. 307; *Pellatt's case.*

The law is well settled, that conditions attached to a subscription, made *after incorporation,* are valid and binding, and unless the conditions are performed, there is no liability. *Fort Miller R. R. Co.* v. *Payne,* 17 Barb. 579; *Philadelphia Co.* v. *Hickman,* 28 Pa. St. 318; *Wear* v. *Jacksonville R. R. Co.* 24 Ill. 593.

If a subscription, made *after incorporation,* is subject to an illegal condition, the whole contract is void, and the subscri-

ber is not liable.   *Fort Edwards R. R. Co.* v. *Payne*, 15 N. Y.
385; *Butterworth* v. *T. Company and North*, 1 Hill, 510.

Mr. WILLIAM B. GIBBS, for the appellee Aaron Gibbs.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The bill in this case  was brought by the Union Mutual
Life Insurance Company, a corporation existing under the
laws of the State of Maine, against the Frear Stone Manu-
facturing Company, a corporation existing under the laws of
the State of Illinois, and the stockholders in the last men-
tioned company.   It is a creditor's bill, and the facts neces-
sary to an understanding of the question of law raised and
discussed may be readily stated, as most of them appear by
admission on demurrer.

An act of the General Assembly of the State of Illinois,
approved February 23, 1867, created a corporation styled the
Northwestern Manufacturing Company.   Section two, of the
charter, provided the capital stock of the company should be
$200,000, and might be increased by resolution of the board
of directors  to any amount not exceeding $1,000,000, and
should be divided into shares of $100 each.   The corporation
was duly organized, under the charter, in 1867, and after-
wards, under the provisions of section two of the charter, the
capital stock of the company was increased, by a resolution of
the board of directors, to $300,000.   The shares were fixed
at $100 each.   The company thus organized commenced, as
it was authorized to do, the manufacture of artificial stone,
under the " Frear patent."

In 1868, a number of persons, named as defendants in the
bill, became subscribers to the capital stock of the North-
western Manufacturing Company, under an agreement, of
which, omitting the date and signatures thereto, the following
is a copy, viz: "We, the undersigned, subscribers to the
capital stock of the Northwestern Manufacturing Company,
of Chicago, do hereby subscribe for, and agree to take, the

number of shares of $100 each, in the stock of said company, set opposite our names, and pay for the same according to the terms following, and as follows, to-wit:

"1st.  The stock of the company shall be and remain as it now is, at $300,000, in shares of $100 each.

"2d.  The business of the company shall be the manufacture and sale of Frear's patent artificial stone, stucco, mastic, cement, etc., and the sale or disposal of the patent right to parties in other parts of the State of Illinois.

"3d.  No assessment shall ever be made upon the stock of the company.

"4th.  The said company are to pay the present owners of the patent right, above mentioned, $125,000 for such exclusive right in and to the State of Illinois.

"5th.  We agree to pay ten dollars upon each share of stock subscribed by us, which is the sum total we shall be held liable to pay.

"6th.  Fifteen thousand dollars of the proceeds of the sale of stock, as above, shall go to the company and be used as further working capital, in carrying on the manufacture.

"7th.  Fifteen thousand dollars in cash shall be paid the present owners for the manufactory and contents on hand for work, including stock on hand, which shall go to the credit of the company, in part payment for this patent right, leaving due the present owners of the patent right the sum of $110,000, which shall be paid out of the first earnings of the company, or the disposal of patent rights in other parts of the State."

The total number of shares which the subscribers to the agreement obligated themselves to take, was two thousand five hundred and eighty-five, of the value of $100 each, representing a total value of stock of $258.500. Persons not subscribers to the agreement, took other shares. Certificates of stock were issued to, and accepted by, the subscribers to the agreement.  On the 9th day of March, 1869, by an act of the General Assembly, the name of the corporation was

changed to "The Frear Stone Manufacturing Company," under which name it continued until it ceased to do business, in January, 1874. On the 8th day of December, 1870, the Union Mutual Life Insurance Co. loaned the defendant corporation the sum of $50,000, which indebtedness was evidenced by a promissory note payable five years after date, with interest, at the rate of eight per cent per annum, and was secured by trust deed on certain real estate owned by the company. The interest was paid on this note until 1872, when default was made. After the maturity of the note, judgment was obtained on it for the sum of $72,254, upon which execution was issued, and, on the 13th day of March, 1877, it was returned by the proper officer wholly unsatisfied. A bill was filed to foreclose the trust deed, and, on decree obtained for the sale of the mortgaged property, it was sold to complainant for $10,000, which, it is alleged, was twice its value. After giving credit for all that was realized by the mortgage sale, there remained the sum of $65,221.06, still owing to complainant, to recover which the present bill was filed against the corporation and the stockholders. Most of the defendants paid $10 on each share by them held, but others paid nothing, and the allegation of the bill is, that each shareholder is liable for the unpaid portion of his stock, whatever it may be. It is further alleged, no officer or agent of the complaining corporation had any knowledge or notice of the existence of the subscription paper, or that the stockholders had, in any manner, undertaken to limit their liability to pay for the stock by them subscribed, until November, 1876, which was long after the indebtedness to complainant had become due. Other matters are stated in the bill, but, as they are not material to the decision of the case, they need not be noted. Most of the stockholders named as defendants, demurred to the bill; others pleaded discharges in bankruptcy; others answered, and some were defaulted. The circuit court sustained the demurrer to the bill, and, as the court was of opinion the bill could not be

maintained against any of defendants, for want of equity, and that no relief could be decreed in favor of complainant on the facts alleged, on motion of complainant the bill was dismissed as to all of defendants, with the reservation to complainant of the right to assign error on the decision. That decree was affirmed in the Appellate Court, and complainant brings the case to this court on appeal.

In the view of the case we have taken, it is not material whether the agreement providing that the capital stock of the corporation shall be non-assessable, applies to the whole stock, or only to that held by the subscribers to the agreement, and we shall not now discuss that question.

The charter of the defendant corporation was granted to it by the General Assembly before the adoption of the present constitution, and, consequently, long before the passage of the general Incorporation act, and is not, therefore, affected either by the constitution or the general law on the subject of corporations. It is not claimed the charter imposes any liability on the stockholders beyond their obligation to pay for the stock by them subscribed, or, what is the same thing, the obligation to pay for such stock implied in the act of subscription. Whether there is any express promise to pay for stock at the time of subscription, or not, the law implies such promise by the acceptance of such stock on the part of the holder. Unless, therefore, the agreement in evidence limits the liability of the stockholders to a less sum, there could be no question as to their liability for the par value of the stock. Upon the construction that shall be given to that instrument, the decision hinges.

It will be noticed the agreement provides: " *First.*—The stock of the company shall be and remain as it now is, at $300,000, in shares of $100 each. * * * * "*Third.*— No assessment shall ever be made upon the stock of the company. * * * * "*Fifth.*—We agree to pay ten dollars upon each share subscribed by us, which is the sum total we shall be liable to pay." It is not shown the corporation

35—97 ILL.

ever assented to the limitation agreement, other than by issuing to subscribers stock under it. That may, however, be regarded as an acceptance of the subscriptions for stock on the terms stated in the agreement. The bill is framed on the theory the agreement, so far as the corporation may have consented to the limitation of the liability of the subscribers to pay the par value of the stock issued to them, is *ultra vires*, but, having accepted the stock, the stockholders, by that act, became liable to pay the par value of the stock issued to and held by them. It is upon the principle, the assets of a corporation are trust funds for the payment of its debts, and the liability to pay for stock, implied in the act of accepting it, becomes as much a part of the trust fund as any asset of the corporation, and may be reached by the aid of the courts. It seems to be conceded such a limitation as that contained in the agreement, would be void if it should be applied to corporations existing under general or special laws imposing personal liability on the stockholders, as an attempt to set aside or avoid a statutory obligation or duty. The argument in favor of the validity of the limitation agreement, insisted upon by the defence, is, that in the absence of any statute imposing personal liability, such an agreement is valid and binding between the corporation and the stockholders, and, as there is no privity between the creditors of the corporation and the stockholders, whatever equity the creditors may have must be worked out against the corporation. One reason assigned for the position assumed is, the creditors can enforce no obligation against the stockholders the corporation itself could not enforce. The latter proposition has neither principle nor the weight of recent judicial decisions for its support. It is not true that creditors of a corporation can not enforce obligations resting upon stockholders that the corporation might not be able to do. The rule rests on the doctrine of estoppel. The contract in this case may be binding on the corporation that accepted subscriptions to its capital stock on the terms therein expressed.

It is for the reason it is competent for a corporation to contract with its stockholders. A corporation has no existence apart from its officers conducting its affairs, and who represent the shareholders. As between themselves, any contract fairly entered into would seem to be valid. At all events, a corporation will be estopped to say its contract is *ultra vires,* and sue its stockholders upon obligations arising by implication of law that it had once solemnly waived. But no such doctrine can be applied to creditors of a corporation. They sustain a widely different relation, both to the corporation and its shareholders. The distinction has its foundation in reason as well as in a sound public policy. The capital stock of a corporation, by most recent decisions, is a trust fund that the directors may not give away or misappropriate to the prejudice of parties whom they have invited to deal with the corporation. The State grants the franchise on the understanding the corporation created will have a capital stock, and the amount is usually fixed before the State parts with the franchise. It is for the security of all persons that deal with the corporation, as well as to afford the means to accomplish the objects of the incorporation. When the charter has fixed the minimum amount of capital stock, what warrant have the stockholders for saying a less sum shall constitute the capital stock? It would simply abrogate, by private agreement, that provision of their charter. Any device, by which the members of a corporation seek to avoid the liability which the law imposes upon them, is void as to creditors, whether binding or not as between themselves. Of this character is an agreement among the members that the shares of the capital stock of the corporation shall be regarded as "fully paid up." Such shares so issued are said to be *ultra vires,* at least to the extent that, on the winding up of the corporation, such shareholders will be adjudged contributories, unless it shall appear they have given for such stock the equivalent in money or in money's worth. Nor is it in the power of the shareholders, by pri-

vate agreement with the corporation, to make the shares of stock issued to them non-assessable so as to excuse payment for such stock at its par value. That would deprive creditors of all security, which is the very thing the Legislature intended to guard against by the provision in its charter, the corporation should have a certain capital stock. The authorities that sustain these views are cited in Thompson's Liability of Stockholders, section 129, and in Green's Brice's Ultra Vires 143.

The contract in this case comes within the inhibition of the principle stated. It was an attempt, by a secret agreement between the shareholders, to limit their liability to the corporation for stock issued to them, to $30,000, when the charter, under which the company acted made the par value of the stock $300,000. It is said, the shareholders having made one contract for themselves, the courts can not make another for them. The fallacy of the argument in support of.this proposition is, that the limitation sought to be imposed is valid as against the creditors. It is subversive of their rights, and therefore inoperative as to them. It is a breach of trust for the directors to issue shares of stock under such restrictions, and shareholders knowingly participating can derive no benefit from such a contract. In the case at bar, the General Assembly had fixed the capital stock the corporation should have, and certainly it was not within the power of the shareholders to say they would fix it at a less sum. It is doubtful whether a corporation can change its capital stock without legislative sanction. The weight of authority is against the right. This would seem to be so on principle. Stockholders are integral parts of the corporation, and if the constituent parts can not, it is a logical sequence the body they compose can not do it.

There is no ground for believing the State would have granted a franchise to this corporation, had it been known its capital stock would not exceed the sum fixed by the stockholders. Such an agreement is inimical to the rights of

creditors, and plainly against a sound public policy. Whether so intended or not, it might be the source of injury to persons trusting the corporation on the faith of its capital stock. The books showed the stock had all been issued, and a person dealing with the corporation may have known the shareholders were responsible, and so given credit to the concern. It would be a novel doctrine if shareholders, after the corporation had incurred large liabilities on the faith of the security supposed to be afforded by the stock held by them, will be permitted to avail of a private agreement between themselves and the corporation whose stock they hold, to the effect, no assessment shall ever be made on the stock of the company, or as in this case, that they have paid ten dollars on each share of stock by them subscribed, and that shall be the sum total they will be held liable to pay. It would be difficult to conceive of a contract more mischievous in its effects, or more at variance with our sense of justice and right. Availing of the benefits of the franchises conferred by the charter, fair dealing would require the shareholders should bear the burdens it imposed. It would be singular, indeed, if the shareholders could appropriate to themselves all profits that might be realized by the corporation, and yet contract to exempt themselves from all losses that might be sustained. Such is not the law, and a contract that would have that effect is clearly void, as being inhibited by a sound public policy. As was said, in *Upton* v. *Tribilcock*, 1 Otto, 45, " equally unsound is the opinion that the obligation of a subscriber to pay his subscription, may be released or surrendered to him by the trustees of the company. This has often been attempted, but never successfully." Most of the cases, certainly in this country, recognize and are based on the doctrine, the capital stock of a corporation is a trust fund for the security of its creditors that the directors have no rightful authority to misappropriate or give away. MILLER, J., in *Sawyer* v. *Hoag*, 17 Wall. 610, speaks of this as a doctrine of modern date, and adds, " it is no solid objection to such a principle that

it is modern, for the occasion for it could not sooner have arisen." The principle is in accord with our sense of justice and fair dealing. A rule that would permit stockholders to covenant with each other that the shares they hold might be taken at a nominal value, and be non-assessable, when the law makes them of par value, would work an injury to creditors the law will not tolerate. Cases of acknowledged authority on the liability of stockholders are: *Burke* v. *Smith,* 16 Wall. 300; *New Albany* v. *Burke,* 11 id. 96; *Sawyer* v. *Hoag,* 17 id. 610; *Upton* v. *Tribilcock,* 1 Otto, 45; *Sawyer* v. *Upton,* 1 id. 56; *Henry* v. *Fer. & Ash. R. R.,* 17 Ohio, 187; *Noale* v. *Callender,* 20 Ohio St. 199; *Hartford & New Haven R. R.* v. *Kennedy,* 12 Conn. 499; *White Mt. R. R.* v. *Eastman,* 34 N. H. 124; *Ogilvie* v. *Knox Ins. Co.* 22 How. 380; *Sagory* v. *Dubois,* 3 Sandf. Ch. 466. Many of these cases on examination will be found to contain reasoning appropriate to the facts of the case in hand. *Sagory* v. *Dubois* is a well reasoned case, and declares the salutary principle, the capital stock fixed by such associations and specified in their certificates, is the amount the legislature required to be paid or secured, as the foundation of the operations the statute permits them to carry on, and is imperatively demanded for the public security. In *Melvin* v. *Lamar Ins. Co.* 80 Ill. 446, this court had occasion to discuss questions analogous with those involved in this decision. It was there said, "the subscribed stock of a corporation, as also its other property, is a trust fund, for the benefit of the general creditors of the corporation, and its governing officers can not, by agreement with a stockholder, release him from his obligation, except by fair and honest dealing for a valuable consideration," citing with approval some of the cases cited *supra.* The same doctrine was declared in *Zirkel* v. *Joliet Opera House Co.* 79 Ill. 334.

It is sought to take a distinction between the cases cited and the one now before the court, and the reason assigned is, defendants do not set up a release of any liability once as-

sumed, but rest upon the terms of a contract between the corporation and the stockholders, under which there was no liability to pay beyond the amount fixed by such contract. The vice of the argument in support of this proposition, lies in the assumption the contract in this regard was valid and operative as against creditors of the corporation—an assumption, as we have seen, that is unwarranted. An objection much like the one taken in this case, was insisted upon in *Melvin* v. *The Lamar Ins. Co.*, and was regarded as untenable. In that case a large number of shares were issued to stockholders, coupled with the right, on their part, to surrender them and take back their money. It was said, " such an agreement will be disregarded, and the party be held bound to all the responsibilities of a *bona fide* subscriber." So in this case. A large number of shares were issued to defendants—an amount in the aggregate nearly equal to the entire capital stock of the company—coupled with an agreement the stock should be non-assessable, and that the stockholders should only be bound to pay ten dollars on each share held by them as the sum total for which they should be liable. On the books of the corporation defendants appeared to be *bona fide* holders, each, of the number of shares for which he had subscribed. The allegation of the bill, admitted by the demurrer to be true, is that no officer or agent of complainant, when it became a creditor of the corporation, had any notice or knowledge of the existence of the agreement purporting to limit the liability of the stockholders. These facts bring the case within the principle of *Melvin* v. *Lamar Ins. Co.*, and that case answers the objection taken in this case.

In *White Mt. R. R. Co.* v. *Eastman*, 34 N. H. 124, defendant subscribed for stock and took an agreement in writing that he might, within one year, surrender a part of the shares taken by him and be discharged. The agreement was held void as a fraud upon other subscribers. The principle sanctioned is, that every subscriber must bear his just proportion of the common burden, to which he professes to bind himself

by the contract he holds out to the public as his contract with the corporation. Other cases, cited *supra,* sustain the same doctrine.

So far as the record before this court discloses, defendants appeared to all persons dealing with the corporation, to be stockholders, with no notice of any agreement their liability for shares held by them was less than what the law would impose in case of an unconditional subscription to the capital stock of a corporation. The secret agreement of the shareholders in this case must be regarded as void—certainly as to creditors of the corporation without notice—and the stockholders held to be bound to all the responsibilities of *bona fide* subscribers.

The judgment of the Appellate Court will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Judgment reversed.*

DICKEY, Ch. J. and CRAIG, J.: We can not concur in the foregoing opinion or decision.