McCLELLAND, Receiver, etc., *v.* WHITELEY.

*(Circuit Court, E. D. Wisconsin.  1883.)*

1. STOCK COMPANIES—SUBSCRIPTION—HOW MADE—LIABILITY—WHEN ATTACHES.

    A person cannot be held liable as a stockholder of a company until his name has been signed by himself or his authorized agent in the stock-book of the company, kept for that purpose. Writing one's name in the private memorandum-book of a party soliciting subscriptions to the stock of the company is not of itself authority to such person to sign a subscription for stock.

2. SAME—PROXY—RATIFICATION OF UNAUTHORIZED ACTS.

    The defendant agreed to subscribe to the stock of a company, providing a certain appointment was secured for him, but declaring at the same time that he could not then subscribe for the stock. He subsequently authorized the

party soliciting for subscription to the stock to appear for him by proxy at the meeting of the stockholders, in anticipation of his future subscription to the stock, which was never made. *Held*, that such proxy was not a ratification by the defendant of the act of the one to whom it was given in having signed defendant's name on the stock-book of the company as a subscriber without his knowledge or consent.

3 SAME—RATIFICATION OF ACTS OF AGENT—WHAT ESSENTIAL TO.

The ratification of an act of an agent previously unauthorized must, in order to bind the principal, be with a full knowledge of all the material facts.

*Owings* v. *Hull*, 9 Pet. 607, followed.

*Jenkins, Elliott & Winkler*, for plaintiff.

*Fish & Dodge*, for defendant.

DYER, J. The plaintiff in this action sues to recover upon an alleged subscription by the defendant of $2,000 to the capital stock of a corporation now dissolved, known as the Chicago Publishing Company, incorporated and organized in 1877, under the laws of Illinois. One O. A. Willard, since deceased, was the largest stockholder, and the president and business manager of the company.

In July, 1878, the Rock River Paper Company, a creditor of said corporation, filed its bill against the publishing company, and all alleged stock subscribers of that company, in the superior court of Cook county, Illinois, to wind up the affairs of the company, and to compel the payment of all subscriptions to stock, for the benefit of creditors. The defendant herein was made a party to that bill. As he was a resident of Wisconsin, no personal service of process could be made upon him, but jurisdiction of him was attempted to be obtained by publication in a manner said to be authorized by the laws of Illinois. In that suit the plaintiff herein was appointed receiver of the property and effects of the publishing company, and subsequently a decree was entered by which it was, among other things, decreed that all of the solvent stockholders or subscribers to the capital stock of said corporation, including the defendant herein, pay, or cause to be paid, to the plaintiff receiver, the several sums of money alleged to be due from them respectively on account of their subscriptions to the stock of the company. Subsequently, the Illinois court made a further order authorizing and directing the receiver to prosecute suit against the defendant herein to recover the amount of his alleged subscription, and it is understand that the various proceedings in the Illinois case were in accordance with the statutes of that state authorizing the same.

The case at bar was submitted to the court without the intervention of a jury, and upon the argument it was contended by the coun-

sel for the defendant that the right or capacity of the receiver to sue was limited to the jurisdiction of the court that appointed him, and that he could not come into this jurisdiction and, as receiver, prosecute this suit against the defendant. Further, that the receiver cannot maintain this action, because he shows no judgment of the court appointing him, which is conclusive against the defendant. In the view which the court takes of the merits of the case, it is unnecessary to pass upon these questions.

Since the superior court of Cook county did not get jurisdiction of the defendant by personal service of process upon him, and as, therefore, its decree was not conclusive as to him, it cannot be denied, and indeed it is admitted, that he may make here the same defense upon the merits that he could have made in the Illinois suit had he appeared therein and contested the question of liability.

The material question for determination then is, did the defendant, upon the facts here shown, incur liability as a stock subscriber of the publishing company? If he did, then he ought to contribute with other stockholders to the payment of the debts of the corporation. The stock subscription-book is in evidence, and the name of the defendant appears therein as representing a subscription for 20 shares, amounting to $2,000. It is satisfactorily shown, however, and this was conceded by counsel for the plaintiff after the proofs were in, that the defendant's signature on the stock-book was not in his handwriting, and was not his genuine signature. That it was written in imitation of his signature is apparent.

Enough is disclosed by the evidence to show that in January, 1878, Willard, who had authority to solicit stock subscriptions, came to Racine, where the defendant resided, and requested him to become a subscriber. The defendant told him he was not in a situation to engage in a joint-stock enterprise. This is shown by the testimony of the plaintiff, who testifies to statements made to him by the defendant concerning the defendant's interview with Willard. Further conversation on the subject was had between Willard and the defendant, but precisely what was said is not directly proven, for the reason that Willard is deceased, and therefore, under the statute, the defendant was not a competent witness to testify to conversations between the parties. The answer alleges that, as the result of the negotiations, the defendant told Willard that if he could secure the appointment of United States consul at Bradford, England, he would be able to take and pay for stock to the amount of $2,000. But, notwithstanding this hiatus in the proofs, enough appears to quite

clearly indicate that the defendant was not then prepared to make a subscription, but that in certain contingencies he would be willing to do so. Thereupon Willard presented to the defendant a memorandum-book, and the defendant wrote therein, "Simeon Whiteley—2,000—20;" the figures evidently meaning $2,000—20 shares. It is satis-factorily shown that this book was Willard's personal memorandum-book and not the stock-book of the company. There was one other signature on the page upon which the defendant thus wrote his name, but nothing was written on the pages which preceded those signa-tures. The fact is not clearly proven, but the whole evidence and the circumstances of the transaction, I think, warrant the inference that the defendant wrote his signature in the manner stated, not as a present subscription, but as indicative of what he would be willing to subscribe in a certain event; for it is clearly demonstrated that he never subscribed for stock in the subscription-book of the com-pany, and he has testified unqualifiedly that he never authorized Willard or any other person to subscribe for him, or to place his name on the company's stock-book, and his testimony is not im-peached.

After the death of Willard, the book which contained the defend-ant's signature was found by his wife among his personal effects, and on the leaves which preceded the page on which the defendant signed his name, there had been written a list of the stock subscribers of the company, with the amount and number of shares subscribed by each, in substantially the same order in which the names of sub-scribers appear on the genuine stock subscription-book of the com-pany. At the top of each page were also written in appropriate places the words "names" —— "amount" —— "shares." On the first page of the first leaf was written, in the handwriting of Willard, "Chicago Publishing Company. Capital stock, $150,000;" and on the second page of the same leaf was written, also in the handwriting of Willard, a form of subscription for stock, which is in fact a copy of the subscription signed by actual subscribers. These leaves were removed from the book which contained them by Mrs. Willard after her husband's death, for reasons stated in her testimony, and are here pro-duced in evidence; and the witness Harriet Dewey, who was in the employment of the publishing company as a clerk, testifies that by Wil-lard's direction she wrote the list of signatures on the pages which pre-ceded the defendant's name after his signature was written therein, thus corroborating the defendant's statement that nothing was written on those pages at the time of his interview with Willard.

After Willard's death and on the thirteenth day of May, 1878, Mrs. Willard, who was then the business manager and treasurer of the publishing company, finding the defendant's name on the stock subscription-book, and undoubtedly supposing him to be a stock subscriber, sent him by mail a certificate for 20 shares of stock, but he immediately returned it and made no payment on account thereof.

It further appears, as a fact in the case, that on or about the eighteenth day of February, 1878, Willard sent to the defendant a blank proxy to vote on stock at a stockholders' meeting thereafter to be held. This proxy the defendant filled up, signed, and returned, and thereby in terms constituted Willard attorney and agent for him, and in his name and stead, to vote as his proxy at any and all meetings of the stockholders of the publishing company, according to the number of votes he should be entitled to vote if personally present. The defendant testifies that the letter in which the proxy in blank was sent to him, did not, according to his recollection, contain any notice of a stockholders' meeting; that he did not then know that his name appeared on the company's stock-book as a subscriber for stock, and that he signed the proxy for the reason that whenever the anticipated time arrived when he should take stock in the company, he desired Willard to have entire control of it.

It appears from the secretary's records that subsequently a stockholders' meeting was held, and that Willard voted or appeared at such meeting, not only for himself, but as the defendant's proxy. There is, however, no proof that the defendant at the time, or subsequently, had any knowledge of those proceedings.

There is nothing in the evidence tending to show that the act of Willard, in causing the list of stock subscribers and the form of a subscription to be placed on the leaves in his memorandum-book, which preceded the page on which the defendant's signature was written, was done with the authority, consent, or even the knowledge of the defendant, and to the point in the history of this transaction when that event occurred, the proofs are wholly inadequate to show that the defendant became a subscriber to the stock of the corporation. He had not made a subscription on the stock-book of the company. He had told Willard he was not in a situation then to engage in the enterprise. He had written his name on a blank page of Willard's private memorandum-book and placed $2,000 opposite his signature. The heading, the list of actual subscribers, and the words "amount" and "shares" were written there afterwards without

his authority or knowledge. He gave Willard no authority to place his name upon the stock subscription-book of the company, and he executed the proxy under the circumstances stated.

Argument is not needed in support of the proposition that, to entitle the plaintiff to recover, it must be established by the evidence that the defendant subscribed a contract to take stock in the publishing company, or that he authorized some person to sign such a contract for him, or that in the absence of such original authority, with knowledge that a subscription had been made in his name, he ratified the act. The first and second of these propositions of fact are not only not proved, but are affirmatively disproved. The only question about which the court has been at all in doubt is that which relates to the effect upon the rights of the parties in interest of the proxy given by the defendant to Willard, February 18, 1878. It is true that that proxy enabled Willard to represent the defendant at a stockholders' meeting and to vote as his proxy according to the number of votes the defendant would be entitled to vote if himself present. But in fact the defendant had not yet subscribed for any stock, and was, therefore, not entitled to vote at such meeting by virtue of any actual subscription. The most, therefore, that can be claimed as the legal effect of the proxy is that the defendant thereby ratified the act of Willard in placing his name on the stock subscription-book of the company. But it is in proof that the proxy was sent only in anticipation of a future subscription which was never made, and that the defendant had no knowledge that Willard had placed his name on the company's stock subscription-book. On the subject of ratification "no doctrine is better settled," said the court in *Owings* v. *Hull,* 9 Pet. 607, "both upon principle and authority, than this: that the ratification of an act of an agent, previously unauthorized, must, in order to bind the principal, be with a full knowledge of all the material facts." To the same effect are *Combs* v. *Scott,* 12 Allen, 493, and *Pittsburgh & Steubenville R. Co.* v. *Gazzam,* 32 Pa. St. 340. In order, therefore, to treat the execution of the proxy as a ratification of the act of Willard in placing the defendant's name on the company's subscription-book, it should appear that the defendant had knowledge of Willard's act. And since it is affirmatively shown that he had no such knowledge and never authorized that act to be done, and further that he had not previously subscribed for stock, and had given no one any authority to subscribe for him, it seems to follow as a necessary conclusion that the giving of the proxy cannot have the legal effect claimed by the plaintiff.

The case has been argued by plaintiff's counsel upon the theory throughout that the defendant agreed to subscribe for stock. This is not proven, and the allegation of the answer on the subject does not sustain such theory. That allegation is that the defendant told Willard that if he secured a certain appointment he would be able to take and pay for $2,000 of stock, and that as a memorandum of such proposition he wrote his name in Willard's memorandum-book. The case is not one of a signature to a contract of subscription with amount, number of shares, and the like left in blank, and the blank to be filled by the representative of the company. It is not the case of an actual signing of a contract of subscription, with an oral understanding making it conditional. It is a case where the party did not subscribe, did not authorize any one to subscribe for him, did not make a legal ratification of an unauthorized act, and, according to the proofs and the allegations of the answer, did not even agree unqualifiedly to take stock in the future. In such a case it is plain that creditors of the corporation have no greater rights or equities, so far as the defendant is concerned, than the company had.

I have carefully examined the case of *Jewell* v. *Rock River Paper Co.* 101 Ill. 57, and find nothing therein in conflict with the conclusions arrived at in the case at bar.

In *Union Mut. L. Ins. Co.* v. *Frear Stone Manuf'g Co.* 97 Ill. 537, the parties sought to be charged were actual subscribers for stock, and it was held that as such subscribers they could not limit their liability by agreement between themselves and the company.

Judgment must be entered in favor of the defendant.