HILL *et al.*, assignees, *vs.* SILVEY *et al.*, and *vice versa.* *

The charter of a bank provided the sum of $200,000 as the minimum amount of capital which would authorize it to do business, and that subscribers for stock should be liable for the debts of the bank to the extent of the unpaid stock subscribed for by them, in proportion to the number of shares held by them. There was a stock subscription list amounting to $408,200, and an organization of the bank in which 2,400 shares of stock were represented. In pursuance of regular calls, the subscribers represented in the organization paid fifty per cent. on their subscribed stock. On June 30, 1873, a return was made to the governor, under section 1467 of the code, representing the capital stock paid in as $140,340, and containing no statement of the capital stock subscribed. No action was taken definitely fixing any amount as the capital stock, until January, 1874, when the stockholders, by resolution, declared that it was thought best to reduce the stock to full paid up stock, that certificates of stock be issued for the amount actually paid in, and that the capital stock and subscriptions be reduced to the amounts actually paid in; providing further that the books should be opened for additional subscriptions of full paid up stock, to remain open until the whole capital stock subscribed should reach the sum of $400,000. No certificates of stock were issued until after this action. Other returns to the governor were made from year to year, showing the amount of capital stock as gradually increasing to $186,300, then decreasing to $160,000 on December 31, 1880, when the last return was made. The bank, becoming insolvent in 1881, made an assignment of all its property, rights, etc., for the benefit of its creditors. Under a bill filed by the State of Georgia in behalf of itself and other creditors, the assignees were appointed receivers of all the property, etc. assigned to them. They brought

*BLECKLEY, C. J., being disqualified, Judge GUSTIN, of the Macon circuit, was designated to preside in his stead.

a bill against the stockholders to collect the remaining fifty per cent. on their subscriptions, alleging that the resolutions above referred to were void, and that the unpaid fifty per cent. were assets of the bank which passed by the deed of assignment, and were a fund in equity to be collected and applied to the payment of the bank's debts. To this bill creditors of the bank also were made parties defendant for the purpose of enjoining them from proceeding by separate actions against the stockholders. It appears that all the debts due by the bank have been created since the adoption of the resolutions mentioned, and no creditor sets up any special claim or equity against the stockholders; and that no credit was given upon the express faith of the original stock subscriptions; and no act or statement of the corporation is shown by which it has ever, in any manner, sought to mislead the public as to the real amount of capital stock. No publicity is shown to have been given to the subscription list, and so far as is disclosed by the record, no creditor knew what it contained:

*Held,* 1. The resolutions had the effect of releasing stockholders, all of them agreeing thereto or acquiescing therein, from further liability to the bank itself, and from obligations each to the other.

2. To the extent of the $200,000, the minimum capital stock allowed. by the charter, creditors had a right to presume that the stock had been subscribed. The fact alone of the commencement of business created that presumption; and to that extent the stockholders were correctly held to be liable, but beyond that amount no such presumption arises.

(*a*) The returns required by law to be made to the governor and published were a source of information open to every person having dealings with the bank. Whether or not they amounted to technical notice, they were a method by which a diligent person could have ascertained the true condition of the corporation with which he was about to commence dealings. If untrue, they would have been conclusive as to the liability of the bank and the stockholders; and it would not be just or equitable to consider them of no effect when true.

(*b*) This case affords strong grounds for holding that the creditors have impliedly waived whatever right, if any, they may have had to call upon these stockholders. Especially is this true as to the State; the same officer being charged by law with the duty of selecting State depositories and receiving these returns.

(*c*) The question as to whether or not the thirteenth section of the charter of this bank created a statutory liability as to stockholders, in addition to that upon the subscription, is not now before this court.

3. Holding that the judgment should be affirmed, under the act of

1887, page forty-one, it is unnecessary to pass upon the questions made by the cross-bill of exceptions; and as the judgment is affirmed, it is also unnecessary to rule specially upon the motion to dismiss.

· February 1, 1889.

Banks. Stockholders. Charters. · Subsequent creditors. Notice. Practice. Before Judge ADAMS. Fulton superior court. September term, 1887.

Reported in the decision.

CLIFFORD ANDERSON, attorney-general, CANDLER, THOMSON & CANDLER, HENRY JACKSON and HARRISON & PEEPLES, for plaintiffs in error.

N. J. HAMMOND, KING & SPALDING, P. L. MYNATT, G. A. HOWELL, HALL & HAMMOND, ABBOTT & SMITH, J. J. ROGERS, HOPKINS & GLENN, HILLYER & BRO., J. B. GOODWIN, T. P. WESTMORELAND and READ & CANDLER, *contra.*

GUSTIN, Judge.

The facts necessary to the decision of the main question in this case are as follows :

The Georgia Banking Company was incorporated by act of 15th of September, 1870. Acts 1870, page 109. Its name was changed to The Citizens' Bank of Georgia, and it was located at Atlanta, Ga., by act of 27th of August, 1872. Acts of 1872, page 95. · The first section of the first act authorized certain persons ·to "receive subscriptions to an amount not exceeding one million of dollars, in shares of one hundred dollars each; whereof ten ·per cent. shall be paid to said commissioners at the time of subscription." It added that "all such subscriptions shall be binding upon the subscribers respectively, and their heirs and legal representatives, and be payable in such instalments and at

such times as the board of directors of said corporation shall prescribe." The second section made the subscribers a body corporate when one million of dollars was subscribed, and ten per cent. thereof paid to the said commissioners. The third section provided that when one hundred thousand dollars was so paid, the commissioners should give notice to meet and organize.

Section thirteen declared: "That the said company shall be responsible to its creditors to the extent of its property, and the stockholders shall be liable to the extent of the full amount of their respective unpaid stock subscribed for by them for the debts of the company, in proportion to the number of shares held by them."

The amending act struck out $1,000,000 in the second section and inserted in lieu thereof $200,000, and struck out $100,000 in the third section and inserted in lieu thereof $20,000.

There was a stock subscription list, under the amended act, amounting to $408,200; the form of the subscription being as follows:

"We, the undersigned, subscribe the amounts and number of shares set opposite our names to the capital stock of the Citizens' Bank, and agree to pay the same, as provided by the charter and board of directors, after organization under the charter."

Part of the subscribers organized on the 9th of November, 1872, twenty-four hundred shares of stock being represented in the organization; and the bank began business 2d January, 1873. In pursuance of regular calls, they paid fifty per cent. on their subscribed stock.

On June 30th, 1873, a return was made to the governor under section 1467 of the code, one of the items of which was, "Capital stock paid in, $140,340." This

return contained no statement of the capital stock subscribed, not paid in.

No resolution or other action was had definitely fixing any amount as the capital stock until, on the thirteenth of January, 1874, the following resolutions were passed by the stockholders:

"It having been the original purpose of the stockholders of The Citizens' Bank of Georgia to pay in only fifty per cent. on the amount of capital stock subscribed by each, and to let the dividends as they accumulated pay the other fifty (50) per cent., and it having since been thought best to reduce the stock to full paid up stock, and to declare and pay the dividends as they are made in cash; therefore,

"*Resolved*, That the original plan be abandoned, and as no certificates of stock have been issued, that certificates of stock be issued to each stockholder on an amount of stock as large as the sum actually paid in by him or her in cash, and that the capital stock and subscriptions be reduced to the amounts actually paid in.

"*Resolved further*, That the board of directors be and they are hereby instructed to open the books of the bank for additional subscriptions of full paid up stock, said books to remain open till the whole capital stock subscribed reaches the sum of four hundred thousand dollars, the stock hereafter subscribed to receive its dividends as earned from the date the cash for the stock is paid in."

No certificates of stock were issued until after this action.   Other returns were made to the governor from year to year, showing the amount of the capital stock as gradually increasing to $186,300 on November 15th, 1876, then decreasing to $160,000 on December 31st, 1880, when the last return was made.

The bank did business until it became insolvent, and on the 13th of April, 1881, it made an assignment to L. J. Hill and W. S. Thomson "of all its property and effects, rights and credits of every kind and character whatsoever, . . . for the benefit of all the creditors of this bank *pro rata.*"   The assignee took possession of the assets to execute the trust.   Afterwards, on the 16th of April, 1881, the State of Georgia, in behalf of itself and all other creditors of said bank who might

join it, filed a bill in Fulton superior court against said
bank *et al.*, and on the 25th of April, 1881, said assignees were appointed receivers of said court "to receive, take and hold all the property and effects conveyed to them by said deed of assignment, convert the
same into cash and hold it subject to the further order
of the court."

In August, 1881, Hill & Thomson, suing as assignees
and receivers, having obtained leave of the court,
brought a bill against the stockholders to collect the
remaining fifty per cent. on their subscription, setting
out the resolutions of January 13th, 1874, but alleging
that they "were passed without any authority of law,"
and that they were "void, and of no force, validity or
effect," and afforded "no valid reason why said amounts
should not be paid," and that such amounts were
debts due by each of them to the Citizens' Bank of
Georgia and assets of the bank, and as such passed by
the deed of assignment, and that they "were and ought
to be a fund in equity to be collected and applied to the
payment of the debts of the bank." The creditors of
the bank were also made parties defendant to this bill
for the purpose of enjoining them from proceeding by
separate actions against the stockholders. It was
averred in the bill that none of the debts due by the
bank were in existence at the time of the adoption of
the resolutions of January 13th, 1874, but that all had
been created since.

All of the defendant stockholders relied upon the
resolutions above referred to as a release from their liability beyond the fifty per cent. paid. Some of them
also made special defences, such as set-off, payment of
debts of the bank, transfers of their stock, etc., not necessary to be considered in this connection. No answer
was filed by any creditor setting out that his debt was

due before that time, nor was any filed setting up any special claim or equity against the stockholders.

Omitting any further statement of the very voluminous pleadings in this case, we come to the consideration of the principal question which we are called upon to decide, whether under this state of facts the subscribers and stockholders are liable at law or in equity to the assignees and receivers, and through them to the creditors of the bank; and this depends upon the validity of the resolutions of January 13th, 1874, considered in connection with the subsequent dealings of this bank with the public and persons having business relations with it.

1. That these resolutions had the effect of releasing stockholders, all of them agreeing thereto or acquiescing therein, from further liability to the bank itself and from obligations each to the other, cannot be seriously doubted. No good reason exists at law or in equity why this could not be done, and it is supported by high authorities. In Scovill *vs.* Thayer, 105 U. S. 153, Justice Miller, in considering an agreement among stockholders to issue certificates for fully paid stock upon which only twenty per cent. had been paid, says: "The stock held by the defendent was evidenced by certificates of full paid shares. It is conceded to have been the contract between him and the company that he should never be called upon to pay any further assessments upon it. The same contract was made with all the other shareholders, and the fact was known to all. As between them and the company, this was a perfectly valid agreement. It was not forbidden by the charter or any law or public policy, and as between the company and the stockholders was just as binding as if it had been expressly authorized by the charter. If the company, for the purpose of increasing its busi-

ness, had called upon the stockholders to pay up that part of their stock, which had been satisfied by "discount" according to their contract, they could have successfully resisted such a demand. No suit could have been maintained by the company to collect the unpaid stock for such a purpose. The shares were issued as full paid, on a fair understanding, and that bound the company."

See also Morawetz on Corporations §§790, 800, 801, 813, 816, 817, 841; Searcy *vs.* Little Rock R. R., 5 Dillon C. C. 348; Cooper *vs.* Frederick, 9 Ala..738; *In re* State Ins. Co., 14 Fed. R. 28; Hepburn *vs.* Comm's, 4 La. Annual, 87; Palfred *vs.* Paulding, 7 La. Annual, 363.

2. It is contended, however, that whatever the effect of the resolutions might have been as between the stockholders and the bank, or among themselves, it could not operate to release the stockholders from liability to creditors. This is based upon the well-recognized principles that the capital stock of a corporation is, in equity, a trust fund for the payment of its creditors, and this whether it has been paid into the company or exists in the form of unpaid instalments; and that it cannot be reduced either by declaring dividends which infringe upon the capital, by release from instalments to become due, by accepting property or work at a false valuation, nor in any like manner; principles that, in their general application, are so universally recognized by courts and writers of undoubted standing, that no authority need be cited in their support. But when it becomes necessary, as in this case, to apply them to and ascertain their bearing upon any particular state of facts, it also becomes necessary to consider the reasons which led to their establishment and the limitations and conditions of their application.

In the earlier cases in which this doctrine is enun-

ciated, the question will be found to have arisen when there was an attempted reduction of the fund representing the capital stock which would have resulted in the non-payment of existing debts. Thus in Slee *vs.* Bloom, 19th Johnson, 456, the trustees of the company sought by a resolution to limit the amount to be collected from stockholders to thirty per cent. of their subscriptions, and in the opinion of the court, Spencer, C. J., says: "The evidence places it beyond all question that the debt due to the appellant, the only creditor of the company, will be partially paid only, if that resolution has the effect intended by it. A large balance will be irrecoverably lost. Now could the trustees pass a by-law having the effect to deprive a creditor of the company of his only means of satisfaction, by a resort to the stockholders ratably until his debt was paid? I answer without hesitation that such a by-law or resolution is utterly inoperative."

In Wood *vs.* Dummer, 3 Mason, 308, the company declared a dividend to such an amount that it infringed upon the capital stock and left an insufficiency for the payment of its creditors. The opinion of Justice Story contains the following: "The capital stock is a trust fund for creditors, and the stockholders, upon the division, take it subject to all the equities attached to it. They are to all intents and purposes privies to the trust, and receive it *cum onere*."

In these and all cases of like character, the rule seems to be absolute and without qualification, for the reason that, as to such creditors, the credit has been acquired and the debts have been contracted upon the express faith of the capital stock subscribed. *Hightower vs. Thornton*, 8 *Ga.* 486.

In later years, another class of cases has arisen in which, after the capital stock has been subscribed, the

fund representing it has been reduced by arrangements among the stockholders, either to treat the whole subscription as paid, when part only has been, to reduce the capital stock after subscription, or other agreements of like character; and the question has arisen in these cases whether as to future creditors the same absolute liability attaches, or whether certain qualifications are to be made according to the circumstances of each case.

A close and careful consideration of the leading authorities leads us to the conclusion that this doctrine can only be maintained as to future creditors in cases where it appears that their credit was or might have been given, their debts contracted, upon the faith of these subscriptions; where the subscriptions did enter or might have entered into the consideration of their contracts with the company.

Sawyer *vs.* Hoag, 17 Wallace, 610, is a leading, perhaps the leading, case in which the liability of the stockholders to future creditors is strongly maintained. In that case, Sawyer subscribed five thousand dollars to the stock of an insurance company, giving his check for the full amount of his subscription, and receiving in return four thousand two hundred and fifty dollars, for which he gave his note payable in five years, with securities. All the other stockholders of the company made the same arrangement. At various times it was reported to the authorities of the State of Illinois, where the company was located, that the stock was fully paid up. The company was declared bankrupt; litigation ensued between Sawyer and the assignee in bankruptcy, in which it was contended that Sawyer's subscription had never been paid, and that what he owed was on the subscription and not on his note, and constituted part of a trust fund for the payment of creditors. The Supreme Court of the United States so held, placing its

decision upon the ground that, as to creditors, the transaction was not a payment of the subscription but only a change of the character of the debt from a stock subscription to a loan of money, from a trust fund to a debt with which the corporation could deal as ordinary assets. This case differs from the one now before us in this, that during the whole existence of the insurance company, the capital stock subscribed by Sawyer was held out to the world and to those dealing with the company as assets upon which they might rely.

Substantially the same questions came before that court in the cases growing out of the failure of the "Great Western Insurance Company." Upton *vs.* Tribelcock, 91 U. S. 45; Sawyer *vs.* Upton, 91 U. S. 56; Webster *vs.* Upton, 91 U. S. 65 ; Chubb *vs.* Upton, 95 U. S. 665. So far as applicable to the case before us, the facts of these cases and the principle decided therein were practically the same as in Sawyer *vs.* Hoag ; and the doctrine was reaffirmed in Scovill *vs.* Thayer, 105 U. S. 143. But in this last stated case, after holding that the stock subscribed is considered in equity as a trust fund for the payment of creditors, they further say : " It is so held out to the public, who have no means of knowing the private contracts made between the corporation and its stockholders. The creditor has, therefore, the right to presume that the stock subscribed has been or will be paid up, and if it is not, a court of equity will at his instance require it to be paid. In this case, the managers and agents of the bankrupt company had, in effect, represented to the public that all its capital stock had been subscribed for and had been or would be paid. Considered therefore in the view of a court of equity, the contract between the company and the stockholders was this, viz. that the stockholders should pay, say for example, twenty dollars per share on their stock

and no more, unless it became necessary to pay more to satisfy the creditors of the company, and when the necessity arose and the amount required was ascertained, then to make such additional payments on the stock as to satisfy that claim that the creditors required."

In the Union Mutual Life Insurance Company *vs.* Frier Stone Manufacturing Company, 97 Ill. 537, a private corporation already organized increased its stock under authority of its charter, and a subscription to the new stock was made upon the agreement set out in the subscription paper that no assessment should be made, and that each subscriber was to pay only ten dollars a share on the new stock, the par value of which was a hundred dollars a share. This provision was held to be void as against creditors of the corporation without notice of it, and in their opinion the court say: " On the books of the corporation defendants appeared to be *bona fide* holders, each of the number of shares for which he subscribed. The allegation of the bill, admitted by the demurrer to be true, is that no officer or agent of the complainant, when it became a creditor of the corporation, had any notice or knowledge of the existence of the agreement purporting to limit the liability of the stockholders. So far as the record before this court discloses, defendants appeared to all persons dealing with the corporation to be stockholders, with no notice of any agreement that their liability for the shares held by them was less than what the law imposed in the case of the unconditional subscription of the capital stock of the corporation. The secret agreement of the shareholders in this case must be regarded as void, certainly as to the creditors of the corporation without notice, and the stockholders held to be bound to all responsibility of the *bona fide* subscribers."

In Jackson *vs.* Treyer, 64 Iowa, 469, decided in 1884,

all of the above cited cases and many others were con-
sidered by the Supreme Court of that State. In that
case a railway company, which was indebted to a con-
struction company in the sum of seventy thousand dol-
lars which it could not pay, issued to members of the
construction company certificates of its stock of the
face value of three hundred and fifty thousand dollars.
It was held that the receivers of these certificates were
liable as stockholders to the creditors of the railway
company for the remaining eighty per cent. of the par
value. But this decision was based largely upon the
fact that the agreement was a secret one which could
not have been known to persons dealing with this cor-
poration.

We have not attempted to cite all of the reported
cases bearing upon this one, but have selected such as
have been mainly relied on by the plaintiffs in error, and
as seemed to give the fullest support to their view of
the case. In every case that we have been able to find,
it is shown, either in the statement of the facts or in
the opinion of the court itself, that the creditors dealing
with these corporations relied, or had a right to rely,
upon the capital stock as the fund for the payment of
their debts. We are therefore led to the conclusion that
the correct rule is that laid down by Woods, J., in
Paper Company *vs.* Woples, 3 Woods, 35: "The rule
with regard to unpaid subscription stock is this: that
whatever sum is subscribed by the stockholders, *and
held out to the public as the stock of the corporation*, is liable
to be called in for the payment of its debts." Or as stated
by Bradley, J., in Coit *vs.* North Carolina Gold Am. Com-
pany, 14 Federal Reporter, 12: " But in every case in
which arrangements have been made for the payment of
stock which precludes the company itself from enforc-
ing any further payment thereof, and yet in which as to

creditors *who can fairly allege that they have relied, or whom the law presumes to have relied, upon the amount of capital stock of the company,* the courts will interfere and impose a trust upon the subscription and set aside the arrangements made for its payment." This decision was made in 1882, after all the decisions of the Supreme Court of the United States above referred to, by one of the justices who presided in all of them.

Testing this case by these rules, it must be apparent that the stock as originally shown by the subscription list, was never held out to the world as the stock of the corporation, and that the creditors did not rely nor will they be legally presumed to have relied thereon. No creditor has by any pleadings or evidence sought to set up any such claim; they rest on the naked fact that the subscription was made. To the extent of the two hundred thousand dollars, the minimum capital stock allowed by the charter upon which business could be commenced, they certainly had a right to presume that the stock had been subscribed; the fact alone of the commencement of business created that presumption, and to that extent we have no doubt that the stockholders were correctly held liable. But beyond that amount no such presumption arises. No act, no statement of the corporation, is shown by which it has ever in any manner sought to mislead the public as to the real amount of its capital stock. Of whatever delinquencies this corporation may have been guilty, and the result seems to indicate that there were grave ones, it must be acquitted of any attempt to deceive or mislead the public or persons dealing with it as to the amount of its capital stock. No publicity is shown to have been given to the subscription list. So far as is disclosed by this record no creditor knew what it contained. Within little over a year after business commenced, the capital stock

was reduced to two hundred thousand dollars, if indeed the resolutions of January, 1874, did not first fix the amount of the stock. A much slighter inquiry on the part of any person desiring to have dealings with the bank would have developed this action than would have been necessary to have ascertained the contents of the subscription list, for that seems not to have been preserved but to have been " among the waste papers of the bank." It may be said that customers of the bank did not have access to the book of minutes. Neither did they to the papers of the bank. There was, however, a source of information alike open to every person having dealings or proposing to have dealings with this bank, the returns required by law to be made to the governor and published. Whether or not these amounted to technical notice, they were a method provided by law by which a diligent person could have ascertained the true condition of the corporation with which he was about to commence dealings. If untrue, they would have been conclusive as to the liability of this bank and these stockholders, and would have afforded the strongest possible basis for the relief sought. *Schley vs Dixon*, 24 *Ga.* 280. It would be neither just nor equitable to consider them as of no effect when true.

Indeed this case affords strong grounds for holding that these creditors have impliedly waived whatever right, if any, they may have had to call upon these stockholders. Especially is this true as to the State, the same officer having been charged by law with the duty of selecting State depositories, and with receiving these returns. Upon this subject we cite Morawetz on Corporations, section 829, (2d edition) as follows : " Thus, persons contracting with a corporation may expressly or impliedly waive their right to compel the shareholders to contribute the full amount of the com-

pany's capital in discharge of the corporate obligations. If a person should contract with a corporation, or voluntarily give it credit, knowing that its capital had not been fully paid up, but was declared to be fully paid up for the purpose of discharging the shareholders from further liability, the evident intention of both parties would be to make the agreement subject to these conditions; and there would be no equity in charging the shareholders with any further liability on account of the obligation so incurred by the company. So if the capital of a corporation was declared to be fully paid up in consideration of specific property of less value than the amount of the capital, a person who should voluntarily deal with the company, knowing the character and value of the property so transferred to the company, would have no claim upon the shareholders for any further contribution of capital. By voluntarily dealing with the company under the circumstances, he must be deemed to have assented to the existing arrangement, the company and its shareholders having offered to contract only on these terms. The fact that such an arrangement is illegal and contrary to public policy, might possibly be a ground for declaring it void, and for dissolving the corporation; but it would not be a ground for giving a creditor who assented to the arrangement rights against the shareholders for which the creditor did not stipulate, and which the shareholders never agreed to give." Robinson *vs.* Bidwell, 22 Cal. 379; Peck *vs.* Coalfield, 11 Bradwell, 88; Coit *vs.* N. C. Gold Amal. Co., 14 Fed. R. 12.

Our attention has been especially invited to the thirteenth section of the charter of this company. If it is contended that this creates a statutory liability as to stockholders in addition to that upon the subscription, that question is not now before us. So far as the lia-

bility upon the subscription is concerned, it is governed by the principles already announced.

3. Holding that the judgment should be affirmed, under the act of 1887, p. 41, it is unnecessary to pass upon the questions made by the cross-bill; and as the judgment is affirmed, it is also unnecessary to rule specially upon the motion to dismiss.

Judgment affirmed.