LOUIS H. COLEMAN, EXR. *et al.*

*v.*

SAMUEL E. HOWE *et al.*

*Filed at Springfield January 14, 1895.*

1. STOCKHOLDERS—*devices to escape liability for subscriptions to stock, void.* Any device by which the members of a corporation seek to avoid liability for the full value of their stock, such as an agreement that the stock shall be "fully paid up," is void as to creditors of the corporation.

2. SAME—*good faith required in valuation of property taken.* Unless there was entire good faith in valuing property taken by the corporation for stock, the stockholders must respond to the creditors of an insolvent corporation for the par value, less actual value of property taken.

3. SAME—*bad faith presumed from exaggerated estimate of property.* Where property of well-known value is taken by a corporation in payment for stock at a highly exaggerated estimate, a strong presumption of bad faith arises, which will be conclusive unless rebutted.

4. SAME—*over-valuation may amount to fraud per se.* The issuance of stock to the amount of $300,000 for property of the well-understood value of but $75,000 is fraudulent on its face, and the stockholders, in case of insolvency of the corporation, must, in such case, respond to creditors for the difference.

5. SAME—*purchaser of stock with notice must pay balance of subscription.* An unpaid balance upon a subscription for stock in a corporation may be reached in the hands of a purchaser who takes the same with notice that there are unpaid arrears of the subscription.

6. SAME—*a case where the purchaser of stock will be liable.* Where stock is issued to a trustee upon a pretended payment in full, and as a device for giving it the appearance of paid up stock, and the same is afterwards transferred to the corporation and re-issued to others as paid up stock, the latter, if taking it with knowledge of the facts, assume all the liabilities of original subscribers, and must respond to creditors.

7. PARTIES—*stockholders, when sued, must make other stockholders parties.* The liability of a stockholder for unpaid stock is several, and when sued with others to enforce his liability on stock, if, upon re-docketing, after reversal, he suffers his co-defendant stockholders to drop from such suit for want of notice, he cannot complain that no decree is taken against them.

8. PLEADING AND PROOF—*bill need not charge fraud in terms.* Under an allegation in a bill that the stock of a corporation is unpaid, proof of facts amounting to fraudulent over-valuation of the property taken for it may be introduced, although fraud is not in terms charged in the bill.

*Coleman* v. *Howe,* 53 Ill. App. 82, affirmed.

APPEAL from the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding.

This is a bill, filed on December 24, 1886, by the appellees as judgment creditors of the Illinois Agricultural Works, an Illinois corporation, alleging the issuance of executions upon their judgments and the return of the same, "no property found," against said corporation and certain stockholders therein, to enforce the liability of certain of said stockholders upon the stock subscribed for and held by them, and alleged to be unpaid to the extent of 50 per cent of the face value thereof. Other judgment creditors were made complainants by petition. The bill alleges, that the corporation was engaged in manufacturing and selling agricultural implements; that it ceased to do business in August, 1886, and was insolvent, and had delivered its property to a creditor bank in pursuance of a trust deed to secure some of its creditors. Of the seven stockholders, who were made defendants, the bill was dismissed as to Reed; default was entered against Post and Louis H. Coleman; Jennie B. Coleman, and Tracy, Mendenhall and Smith filed answers, as did also the defendant corporation. During the progress of the litigation Jennie B. Coleman, wife of Louis H., died testate, and her husband, as executor of her estate was made a defendant. Upon the first hearing in the Circuit Court the bill was dismissed. This decree of dismissal was reversed by the Appellate Court in April, 1892. (*Howe et al.* v. *Ill. Agricultural Works,* 46 App. Ct. Rep. 85). After the cause was remanded, the Circuit Court rendered

a decree, finding that there was due to the creditors upon their judgments the aggregate amount of $19,988.96 ; that Mrs. Coleman, or her estate, owned 200 shares of the stock, $20,000.00, Smith 100 shares, $10,000, Mendenhall 50 shares, $5000.00, and Tracy 100 shares, $10,000.00; and decreeing that Tracy pay $4441.99, Smith $4441.99, Mendenhall $2221.00, and L. H. Coleman, executor, $8883.98, these several amounts making all together the total amount due.    The decree found, that the stock was issued to and received by each of these defendants for the consideration of one half only of its face value, and that they were liable for the remaining one half of the par value of the stock held by them respectively to the extent necessary to pay said claims.    The second decree thus entered by the Circuit Court has been affirmed by the Appellate Court, and the present appeal is prosecuted from such judgment of affirmance.

The material facts developed by the proof are as follows :  In the spring of 1883 L. H. Coleman, Post & Reed formed a partnership under the firm name of Coleman, Post & Reed for the purpose of manufacturing agricultural machinery, and entered upon that business in Springfield.    A tract of 7½ acres of ground, worth $6000.00 or $7000.00, was donated to them, and they put into the concern about $60,000.00.    They continued to do business as a firm until November, 1884, at which time their whole plant, including ground, building and machinery was worth not to exceed $75,000.00, and they were in debt to the amount of $70,000.00.

On September 19, 1884, Coleman, Post & Reed formed the corporation known as the "Illinois Agricultural Works," with a nominal capital stock of $300,000.00. Their report as commissioners showed subscriptions as follows :   L. H. Coleman, 1500 shares, $150,000.00; Post, 1000.00 shares, $100,000.00; Reed, 500 shares, $50,000.00. Neither of them paid any money into the treasury of the corporation, but transferred to it their said firm property

in the manner hereinafter stated. They were reported as
directors for the first year. The articles of incorporation
were filed in Sangamon County, where all the parties
lived, on September 22, 1884, but the said directors for
the first year met for organization for the first time on
October 28, 1884, when Coleman was elected president,
Reed, secretary, Post superintendent, and Mendenhall
treasurer. Coleman, Post & Reed prepared a deed, dated
October 23, 1884, which was acknowledged by them on
November 21, 1884, and recorded on that day, convey-
ing their entire plant for an expressed consideration of
$300,000.00 to the said corporation.

It was represented, before the corporation was organ-
ized, that the firm had made a profit in its business,
during the year, of $18,000.00; and the capital stock
was fixed at $300,000.00, because that was the amount,
which, at 6 per. cent interest, would yield $18,000.00.
The evidence shows, that interviews were had, before
any stock was issued, with Tracy, Mendenhall, Smith
and Mrs. Coleman, in which they agreed in advance that
they would take stock at 50 cents on the dollar. It was
also understood in advance, that Coleman, Post and Reed
were to get half of the stock, or stock of the face value
of $150,000.00, at 50 cents on the dollar. All that the
corporation received for the issue of the $300,000.00 of
stock was the conveyance to it of the property worth
only $75,000.00; and the corporation assumed the pay-
ment of the $70,000.00 of indebtedness owing by the old
firm, as hereinafter stated. There seems to have been a
verbal subscription for the stock by the seven stockhold-
ers already named, before the original subscriptions as
reported to the Secretary of State were made. Tracy was
to get stock of the face value of $10,000.00 for $5000.00;
Smith was to get stock of the face value of $10,000.00 for
$5000.00; Mendenhall was to get stock of the face value
of $5000.00 for $2500.00; and Mrs. Coleman was to get
stock of the face value of $20,000.00 for $10,000.00. Stock

for these amounts was subsequently issued to them severally upon payment of the respective sums stated.

A stock book was procured on September 22, 1884. The first issue of stock seems to have been as follows : $75,000.00 to Coleman, $50,000.00 to Post, $25,000.00 to Reed, $10,000.00 to Tracy, $10,000.00 to Smith, $5000.00 to Mendenhall. The evidence is somewhat conflicting as to how many certificates of stock were made out upon the first issue, but four certainly were made out at first to Coleman for $75,000.00, to Post for $50,000.00, to Reed for $25,000.00 and to Tracy for $10,000.00. When Tracy's certificate was presented to him, he declined to receive it, saying that the stock had not been properly issued, that the issue should first be to the original subscribers, that there was "only one way to issue it, and that was by a trustee, surrendering the stock they had and then issue it in place of that stock; they did not seem to get at the *modus operandi* of keeping that stock till that time." Thereupon the first issue was destroyed, and the stock book was burned. A new stock book was then obtained, and, on October 23, 1884, there was a new issue of stock in the manner following :   1500 shares, $150,000.00 to Coleman ;  1000 shares, $100,000.00 to Post ;  500 shares, $50,000.00 to Reed, making $300,000.00 in all. It will be observed, that this second issue was made five days before the board of directors organized by the election of officers on October 28, 1884.

The certificates for these shares were surrendered on November 10, 1884, there having been assignments on the backs of the certificates of one half the shares, amounting to $150,000.00, to Mendenhall, trustee; and on that day certificates were issued and receipted for to Coleman for 750 shares, $75,000.00, to Post 500 shares, $50,000.00, to Reed 250 shares $25,000.00, and to Mendenhall, trustee, 1500 shares, $150,000.00. The certificate to Mendenhall, trustee, for 1500 shares was afterwards surrendered and filed on November 27, 1884. On No-

vember 24, 1884, a certificate for 200 shares, $20,000.00, was issued to Mrs. Coleman and receipted for by her; a certificate for 100 shares, $10,000.00, was issued to Smith and receipted for by him per F. W. Tracy ; on November 27, 1884, certificates for 50 shares were issued to Mendenhall, and receipted for by him; a certificate for 100 shares, $10,000.00, was issued to Tracy and receipted for by him; and a certificate for 1050 shares, $105,000.00, was issued to Mendenhall, trustee, and receipted for by him.

It was after the third issue, by which stock to the amount of $150,000.00 was issued to Coleman, Post and Reed, that they delivered to the corporation their deed for the plant worth only $75,000.00, so that in reality they paid for their stock only fifty per cent of its face value. The evidence is unquestioned, that Smith, Tracy, Mendenhall and Mrs. Coleman only paid fifty cents on the dollar for the stock issued to them of the face value of $45,000.00. They appear to have received their stock directly from the corporation, and not from Mendenhall, trustee. The stock amounting to $105,000.00 remaining in Mendenhall, as trustee, belonged to the corporation. He paid nothing for it; he was a stockholder and the treasurer; and this trust stock was placed in his hands for sale for the benefit of the corporation; he was to put it on the market, and sell it at 50 cents on the dollar. Coleman swears, that the 1500 shares of stock issued to Mendenhall, trustee, was surrendered to the corporation in consideration of its assumption of the indebtedness of $70,000.00, which latter amount was less than 50 cents on the dollar of the face value of the stock so surrendered. The debts due to these appellees were embraced in the debts so assumed.

GREENE & HUMPHREY, and JAMES H. MATHENY, for appellants Coleman, Mendenhall and Tracy:

In order to entitle even a creditor to question the valuation of property taken in exchange for capital stock

of a corporation there must have been absolute fraud, and of such fraud the persons sought to be charged must have had notice when they acquired their rights.

Unless prohibited by statute, an agreement between the incorporators of a company and the directors, by which the former convey to the company property needed for the purpose of its operations and receive payment therefor in full paid shares of the stock of the company, is, in the absence of fraud, binding upon the parties, and such stock is full paid stock. *Phelan* v. *Hazard*, 5 Dill. 45; 2 Morawetz on Corp. sec. 825 ; Thompson on Liability of Stockholders, sec. 185 ; *Peck* v. *Coal Co.* 11 Ill. App. 88 ; *Bank* v. *Alden*, 129 U. S. 372.

If the property or services contributed were valued by the agents of the corporation, in good faith, at a certain sum, creditors would be bound thereby, though the valuation may prove to be excessive.   2 Morawetz on Corp. sec. 825.

A purchaser of shares that purport to be fully paid, who buys without notice to the contrary, is protected. 2 Morawetz on Corp. sec. 836 ; Thompson on Liability of Stockholders, sec. 135.

If a party extends credit, or deals with a corporation knowing that the stock subscriptions have been paid in property of less value, he is bound by the arrangement, and can have no claim against the stockholders.   *Coit* v. *Gold Co.* 14 Fed. Rep. 12 ; 2 Morawetz on Corp. sec. 829 ; *Peck* v. *Coalfield Coal Co.* 11 Ill. App. 88.

The corporate creditor must prove that the valuation was intentional and fraudulent.   Until this is done the courts refuse to interfere with the discretion which has been exercised by the corporate authorities in valuing the property received.   Cook on Stock and Stockholders, sec. 44; Thompson on Liability of Stockholders, sec. 134.

While such contract stands unimpeached, the courts, even where the rights of creditors are involved, will

treat that as payment which the parties have agreed should be payment.

BROWN, WHEELER & BROWN, for appellant Jay Smith:

If the stock were set afloat and put upon the market, purporting, on its face, to be full paid, the purchaser or assignee cannot be called upon to respond to a creditor of the corporation, unless it appears that such purchaser or assignee had actual notice that the stock was not fully paid. 2 Morawetz on Private Corp. sec. 836, and cases cited; Cook on Stock and Stockholders, secs. 50, 256, and cases cited.

W. L. GROSS, and CREA & EWING, for appellees:

Shareholders cannot, by private agreement with the corporation, or among themselves before the formation of the corporation, make shares of stock non-assessable, so as to excuse payment for such stock at its par value to creditors. *Insurance Co.* v. *Frear Stone Manf. Co.* 97 Ill. 537; *Alling* v. *Wenzel,* 133 id. 264, and cases cited.

A bill of this kind may be maintained against any one or more of the delinquent shareholders. *Hatch* v. *Dana,* 101 U. S. 205; *Clapp* v. *Peterson,* 104 Ill. 26; *Hickling* v. *Wilson,* id. 54; *Patterson* v. *Lynde,* 112 id. 196.

If brought against several, the bill may be dismissed as to any defendant, and proceed against the others. *Blair* v. *Reading,* 99 Ill. 600.

Even in cases against stockholders, where they are required to contribute *pro rata* to a common fund for the benefit of creditors, it is not necessary to make insolvent stockholders parties. Cook on Stock and Stockholders, sec. 206; 1 Morawetz on Corp. sec. 315.

The bill and proceedings under it amount simply to an equitable seizure, and an appropriation of a debt due from appellants to the corporation. *Hatch* v. *Dana,* 101 U. S. 205; *Patterson* v. *Lynde,* 112 Ill. 196.

The creditor is subrogated to the place of the debtor corporation. *Patterson* v. *Lynde*, 112 Ill. 204; *Clapp* v. *Peterson*, 104 id. 35 ; *Hickling* v. *Wilson*, 104 id. 64.

The failure of appellees to prosecute their suit against Coleman and Post amounts simply to a discontinuance or dismissal as to them, and does not, in any way, affect the proceedings against appellants. *Callahan* v. *Myers*, 89 Ill. 566 ; *Lochnitt* v. *Stockom*, 31 Ill. App. 217; *Breedenthal* v. *McKenna*, 14 Pa. St. 160.

The capital stock of a corporation is the aggregate of the par value of all the shares into which the capital is divided.   Cook on Stock and Stockholders, sec. 199.

The law requires that the entire capital stock shall be taken, and that its face value, in some form, shall find its way into the treasury of the corporation.   Cook on Stock and Stockholders, sec. 199; *Insurance Co.* v. *Frear Stone Manf. Co.* 97 Ill. 537.

If, for any reason, the stockholder fails to pay for his stock, either in whole or in part, the amount remaining unpaid constitutes a trust fund to which creditors may resort.   Cook on Stock and Stockholders, sec. 199.

The directors of a corporation are trustees, standing in a fiduciary relation, not only to the stockholders, but to the creditors of the corporation, and may not give away, waste or diminish the assets of the concern.   Cook on Stock and Stockholders, sec. 648; *Upton* v. *Tribilcock*, 91 U. S. (1 Otto,) 45 ; *Alling* v. *Wenzel*, 133 Ill. 264; *Holden* v. *Railway Co.* 71 id. 106 ; *Thompson* v. *Savings Bank*, 19 Nev. 103.

All parties dealing with a trustee in regard to trust property must take notice of the trust and of the rights of the *cestui que trust*, and are chargeable with notice of everything which, on proper inquiry, they might have ascertained from the *cestui que trust*.   *Duncan* v. *Jaudon*, 15 Wall. 165 ; *Shaw* v. *Spencer*, 100 Mass. 382.

The contract of subscription for stock need not be in writing.   It may be verbal, and may be inferred from

facts and circumstances, like any other contract. *Jackson* v. *Traer*, 64 Iowa, 469 ; Cook on Stock and Stockholders, sec. 52.

No device, however plausible, though good as between the stockholders, will, as against the creditors of the corporation, deprive the corporate stock of its trust character or excuse the stockholders from payment therefor in full. *Sawyer* v. *Hr y,* 17 Wall. 610 ; *Alling* v. *Wenzel*, 133 Ill. 264; *Upton* v. *Tribilcock, supra.*

A purchaser of a certificate, who surrenders it and has one issued to him directly, and has his name entered on the stock book, becomes subrogated to the rights and assumes the liability of the original subscriber to the stock. *Upton* v. *Hansbrough*, 3 Biss. 429.

Gross inadequacy of price is sufficient to put the purchaser upon inquiry, and charge him with all that might have been learned by diligent investigation. *De Witt* v. *Perkins*, 22 Wis. 473 ; *Hoppin* v. *Daily*, 25 id. 573 ; Wade on Law of Notice, sec. 23.

Unless the rule has been changed by statute, the liability to pay calls, and to respond, in the event of insolvency, to creditors, attaches to the holder of the legal title, only. The courts will not look beyond the registered shareholder, nor inquire under what equities he holds. Thompson on Liability of Stockholders, sec. 178 ; 2 Morawetz on Corp. sec. 852; *Wheelock* v. *Kost*, 77 Ill. 298 ; *Griswold* v. *Seligman*, 72 Mo. 110 ; *Fisher* v. *Seligman*, 75 id. 13 ; *Winston* v. *Paving Co.* 129 Ill. 64.

MAGRUDER, J.: The capital stock of an insolvent corporation is a trust fund for the payment of its debts. If a stockholder has not paid his subscription in full, he is liable for the debts of the corporation to the extent of the unpaid portion of his subscription. It is the duty of the directors of a corporation to manage its capital stock as a trust fund for the benefit of its shareholders while it exists and of its creditors in case of its dissolu-

tion. This trust fund consists not only of the capital paid in, but also of that which the shareholder has promised to pay in. The unpaid stock is as much a part of the corporate assets, as the money which has been paid upon the stock. The obligation of a subscriber to pay his subscription cannot be released or surrendered to him by the trustees of the corporation. Nor will stockholders be permitted to agree among themselves, that their shares shall be taken at a nominal value, or be non-assessable, when such agreement operates to the injury of creditors. (*Upton* v. *Tribilcock*, 91 U. S. 45; *Sanger* v. *Upton*, 91 id. 56). "Any device, by which the members of a corporation seek to avoid the liability which the law imposes upon them, is void as to creditors, whether binding or not as between themselves. Of this character is an agreement among the members that the shares of the capital stock of the corporation shall be regarded as fully paid up," when in fact they are not fully paid. (*Union Ins. Co.* v. *Frear Stone Manf. Co.* 97 Ill. 537). The question presents itself in this case, whether the stock held by the appellants was stock which had been in good faith fully paid up, or whether it must be regarded as stock upon which only fifty per cent had been paid, and upon which fifty per cent remained unpaid, as a fund liable to be subjected by the appellees to the payment of their judgments.

It is held, that stock may be paid for in property as well as in money. (2 Morawetz on Priv. Corp. sec. 825; 23 Am. & Eng. Enc. of Law, page 794). In the present case, the capital stock was paid for in property alone. Property worth not more than $75,000.00 was conveyed in exchange for capital stock amounting to $300,000.00. There was here an over-valuation of the property which formed the consideration for the issue of the stock. Cases may arise, where stock is issued for property taken at an over-valuation, which will justify the courts in compelling the stockholders to respond to the creditors for the

par value of the stock less the actual value of the property taken in exchange for it.    Such will not be the case where there is entire good faith in making the valuation.    But if the property contributed is not valued in good faith, the shares of stock will not be fully paid up, either in law or fact, by the contribution of such property. A declaration by the corporation that the shares are paid up will not avail against the creditors in case of insolvency.    (2 Morawetz on Priv. Corp. sec. 825).    "The courts have inflexibly enforced the rule, that payment of stock subscriptions is good as against creditors only where payment has been made in money, or what may be fairly considered as money's worth." (*Wetherbee* v. *Baker*, 35 N. J. Eq. 501).

Some of the cases hold, that over-valuation will not render the stockholder liable for the difference between the actual and accepted values unless there is affirmative proof of fraud *aliunde*.    But other cases hold what we regard as the better view, namely, that, where property, whose value is well known or can be easily learned, is taken at an exaggerated estimate, a strong presumption is raised that the valuation is not in good faith and is made for a fraudulent purpose.    This presumption will be conclusive unless rebutted by satisfactory evidence explanatory of the apparent fraud.    Where the over-valuation is so great that the fraudulent intent appears on its face, and is not explained, the court will hold it to be fraudulent as matter of law.    (1 Cook on Stock, etc. sec. 47; 23 Am. & Eng. Enc. of Law, pages 859, 860; *Douglass* v. *Ireland*, 73 N. Y. 104; *Boynton* v. *Andrews*, 63 id. 93; *Boynton* v. *Hatch*, 47 id. 232; *Osgood* v. *King*, 42 Iowa, 478). In *Boynton* v. *Andrews, supra,* stock for $100,000.00 was issued for property worth $50,000.00, and it was held that there was a gross over-valuation, and that the transaction was fraudulent in law on its face.    In the case at bar, the proof shows clearly that stock for $300,000.00 was issued for property worth only $75,000.00, an over-

valuation so gross that we cannot but regard it as fraudulent on its face; and its real value was well understood by the parties transferring it to the corporation.     It is said, that there was value in certain patents held by Post, under which the machinery was manufactured, and in the prospect of future profits from the business, but these considerations were of small moment when it is remembered that the property was not conveyed clear of incumbrance, but was subject to $70,000.00 of firm debts before its transfer, and was still subject to them after the transfer by reason of the assumption of their payment by the corporation.

The proof shows, that the appellees Tracy, Smith, Mendenhall and Mrs. Coleman were fully aware of the over-valuation.   Tracy knew the value of the plant.   As a banker he had loaned the firm money upon the property as security.    Smith had made a personal inspection of the property and was told about it by Post and by Tracy, the latter being his agent who invested in the stock for him.   Mrs. Coleman not only inspected the plant and the books, but was informed by her husband of the exact condition of affairs.    The same information was possessed by Mendenhall who conferred with both Post and Coleman.    These parties cannot be regarded as innocent purchasers of the stock without notice of the real value of the property upon which it was based.    The very fact that, before the corporation was organized and before any stock was subscribed for, they agreed in advance to pay only 50 cents on the dollar for the stock afterwards issued to them, shows that they knew of the over-valuation of the property by at least fifty per cent; for they were all aware that the original subscribers paid no money for their stock, but took it in exchange for the plant.

Counsel claim, that the stockholders cannot be held liable on account of the over-valuation, unless fraud is shown, and that, even if the proof shows a fraudulent

over-valuation, there is no allegation of fraud in the bill. The bill distinctly charges that the corporation was organized with a capital stock of $300,000.00, and that the shares were not paid for in full by the original subscribers, and that appellants took their shares at 50 cents on the dollar, knowing that the original subscribers had not paid for them in full, and knowing that the debts of appellees existed against the corporation. The proof sustains the charge. If there is a fraudulent over-valuation of the property taken by the corporation for the stock, the stockholder is liable for the difference between the actual value and the accepted value of such property, and consequently his stock is regarded as unpaid stock to the extent of that difference. Hence, proof of fraudulent over-valuation is proof that the stock is unpaid. Under the allegation that the stock is unpaid, any proof that it is unpaid, even though it be proof of the unpaid difference referred to as growing out of a fraudulent over-valuation, may be legitimately introduced.

It is not necessary, however, to hold in this case that appellants are liable for more than fifty cents on the dollar of their stock as being unpaid. They received stock of the face value of $45,000.00 for which they paid only $22,500.00. The decree of the Circuit Court and the judgment of the Appellate Court have found them liable to pay about $20,000.00 of the sum of $22,500.00 toward the discharge of the judgments of appellees, upon the theory that the latter amount represented the extent to which the stock held by appellants was unpaid. Their claim, however, is that they cannot be regarded as original stockholders, or original subscribers to the stock, but that they purchased it at second hand as paid up stock from Mendenhall, trustee, at 50 cents on the dollar, and are, therefore, *bonâ fide* holders of it.

A purchaser or assignee of stock, which has not been fully paid, does not become liable to the corporate creditors for the unpaid balance, where the stock has been

issued as fully paid, and he has acquired the same in good faith and without notice that it has not been fully paid. But where a person purchasing stock issued as paid up has notice that it has not been paid, his liability is the same as that of the party who transferred it to him. (1 Cook on Stock and Stockholders,—3 ed.—secs. 49, 50; *Jackson* v. *Traer*, 64 Iowa, 469). The equitable doctrine, that the capital stock is a trust fund that may be followed by the creditors of the corporation, and that any balance remaining unpaid thereon may be reached by such creditors, applies not only to original subscribers to the stock, but also to purchasers or assignees with notice of the fact that all of the stock has not been paid for. We do not think that, under the evidence in this case, the appellants can be regarded as such *bona fide* purchasers without notice. In the first place, the stock was issued to them directly by the corporation, as belonging, not to the original subscribers, but to the corporation itself. In the second place, if it be regarded as having been issued by Mendenhall, the trustee, the scheme, by which it was placed in the hands of the trustee, was a mere device for evading the law, and for giving to the stock the appearance of being fully paid up, when one half of it was unpaid. As matter of fact, the original subscribers for the stock never really owned more than half of it; and that they were to get half of the original issue at 50 cents on the dollar was known to appellants before its issue. Not only was it understood, before the corporation was organized and before it acquired any property, that appellants were to take stock at 50 cents on the dollar, but the issue of all the stock to the promoters, and its surrender, and its re-issue to them and to the appellants, and to the trustee, were steps taken with the knowledge of appellants, and by arrangement with them and with the trustee.

In *Alling* v. *Wenzel*, 133 Ill. 264, it appeared that, before stock was issued, it was transferred upon the books to

the company itself and was called "treasury stock;" that the corporation sold portions of it at less than its par value; that the parties procuring it from the corporation knew, that the corporation was not receiving par value therefor, and took it from the company at less than its face value; and we held that "the plan * * * pursued was but a device to evade the law, and to defeat its useful and wholesome provisions." The original subscribers for the $300,000.00 of stock surrendered it to the corporation. Half of it was re-issued to them, and the stock acquired by appellants was a part of the other half retained by the corporation. Not only were the certificates of stock issued directly to appellants by the corporation, but their names were entered on the stock book as original subscribers and not as transferees. They thereby became subrogated to the rights and assumed the liabilities of original subscribers to the stock. (*Upton* v. *Hansbrough*, 3 Biss. 429).

The transaction, by which the appellants received stock of the face value of $45,000.00 for one half that amount, amounted to nothing more than an agreement between them and the corporation, that the remaining fifty per cent of the stock should not be called for. Such an agreement cannot be sustained as against creditors. The issue of paid up shares at less than their par value is a fraud upon the creditors. (*Union Mut. Life Ins. Co.* v. *Frear Stone Manf. Co. supra; Jewell* v. *Rock River Paper Co.* 101 Ill. 57; *Scovill* v. *Thayer*, 105 U. S. 143; *Jackson* v. *Traer, supra; Clapp* v. *Peterson*, 104 Ill. 26).

There is evidence in the record, that Coleman told appellee, Loeb, the holder of the largest judgment against the corporation, that the new stockholders, the present appellants, had paid but fifty cents on the dollar for their stock, and were perfectly good for the other fifty cents. Loeb was thereby assured that his debt was secure, and did not press for the payment of his claim. Such representations were calculated to induce the creditors to rely

upon the responsibility of the corporation, which had assumed the payment of their debts.

It is claimed that the decree was erroneous in assessing the entire amount of the claims of appellees against appellants, and assessing nothing against Coleman and Post. We understand counsel to abandon this objection so far as Reed is concerned. Reed could not be found and was not served, and the bill was dismissed as to him. In *Hatch* v. *Dana*, 101 U. S. 205, it was held that, where a creditor's bill is filed upon return of execution *nulla bona* by the creditor of a corporation to reach the unpaid balance due upon a subscription for stock, it is not necessary to make all the stockholders defendants. It is sufficient if those stockholders are defendants whose unpaid subscriptions it is sought to reach. It may be otherwise where the proceeding is under the statute to wind up the corporation, because there all the shareholders, so far as they can be ascertained, should be made parties, so that "complete justice may be done by equalizing the burdens, and in order to prevent a multiplicity of suits." (*Hatch* v. *Dana, supra*). But the liability of a stockholder for unpaid stock is several, and not joint. In case of a suit by creditor's bill to reach such unpaid stock, "there is not the same reason for requiring all the stockholders to be made defendants. In such a case no stockholder can be compelled to pay more than he owes;" (Idem;) "the creditor is subrogated to the place of the debtor corporation, and the proceeding is in the nature of an equitable attachment by which the debts due the company may be applied to the payment of its own debts." (*Patterson* v. *Lynde*, 112 Ill. 196). The doctrine of the case of *Hatch* v. *Dana* has been substantially endorsed by this Court. (*Clapp* v. *Peterson*, 104 Ill. 26; *Hickling* v. *Wilson*, id. 54; *Patterson* v. *Lynde, supra; Young* v. *Farwell*, 139 Ill. 326). The stockholder, who is made a defendant to the creditor's bill, may file a cross-bill and bring in the stockholders who are not parties, and enforce contributions

from them.  (*Young* v. *Farwell, supra*).  But if he neglects to do so, the remedy against himself does not fail.

In the case at bar, Post and Coleman were made defendants and served, and default was entered against them.  The Appellate Court say in their opinion affirming this decree: "The first hearing resulted in a dismissal of the bill as to all the defendants.  The present appellees brought that record to this court by a writ of error, and the only question then contested was as to the liability of the present appellants.  The reversal opened the whole case, and when the cause was remanded it was to be heard anew.  Notice of the motion to re-instate was served upon the appellants, but not upon Post, or upon Coleman in his personal capacity, and the cause proceeded to a second hearing in this shape, no further attention being paid to Post and Coleman.  Whether this was by design or from mere oversight we cannot ascertain from the record, but it is hardly presumable that a matter so apparent was overlooked.  *  *  *  Reed was dropped out of the case early in its history.  By going to a hearing upon re-instatement without notice to Coleman and Post the contesting parties dropped them also from the case.  No other fair inference arises from such action, and having tried the case in this condition without suggestion of irregularity in the court below, neither side should be permitted to make objection on that account for the first time in this court."  Such being the condition of the record, appellants suffered no injury from the failure to take a decree against Coleman and Post inasmuch as the evidence shows that they were insolvent.  If the liability of appellants upon their unpaid stock could be reached under a bill of this kind in case Coleman and Post had not been made parties at all, the result is practically the same here under a decree, which does not embrace them within its terms, in view of their insolvency.

Even under the stricter rule which prevails where the proceeding is to wind up the corporation under section 25 of the Corporation Act, if any stockholder shall not have property enough to satisfy his portion of the debts, then the amount shall be divided equally among all the remaining stockholders. (1 Starr & Cur. Ann. Stat. page 618).

We find no error in the record which would justify us in reversing the judgment. Accordingly, the decree of the Circuit Court and the judgment of the Appellate Court are affirmed.

*Judgment affirmed.*