National Bank of America et al. v. Pacific Railway Company et al.

1. CORPORATIONS—*Liability of Stockholders for the Debts of the Company.*—A stockholder, to whom stock is issued as full paid, in exchange for property of known less value than the nominal value of the stock, is liable to the creditors of a corporation for the difference, and this is so even in the absence of fraud.

MR. JUSTICE WATERMAN dissenting.

**Bill by Creditors of a Corporation against Stockholders, etc.—**
Appeal from the Circuit Court of Cook County; the Hon. OLIVER H.
HORTON, Judge, presiding. Heard in this court at the March term, 1896.
Reversed and remanded. Opinion filed June 29, 1896.

WALKER & EDDY, MORAN, KRAUS & MAYER and WINSTON
& MEAGHER, solicitors for appellants; EDWIN WALKER, T. A.
MORAN and J. F. MEAGHER, of counsel.

HERRICK, ALLEN, BOYESEN & MARTIN, GREEN, ROBBINS &
HONORE, JAMES L. HIGH, EDWIN BURRITT SMITH and WILSON,
MOORE & MCILVAINE, attorneys for appellees.

MR. PRESIDING JUSTICE GARY DELIVERED THE OPINION OF
THE COURT.

This case presents a question, arising not infrequently,
and of great and permanent interest.

It was once decided in this court, but without the aid of
the exhaustive argument that is now presented, and with-
out that degree of consideration which we have now given
it; and if that decision was wrong, we ought not to
follow it.

That question is whether—in the absence of fraud—
stockholders to whom stock is issued as full paid, in ex-
change for property of known less value than the nominal
value of the stock, can be made liable to creditors of the
corporation for the difference.

It has never, so far as we are advised, been expressly de-
cided in this State that stock could be paid for in anything
but money.

It is assumed, in Coleman v. Howe, 154 Ill. 458, that it
may.

Referring to Section 7 of the Corporation Act, we said in
Alling v. Wenzell, 35 Ill. App. 246, that " it probably never
entered into the contemplation of the legislature that stock
in a corporation was to be issued by it for any other con-
sideration than money equal to the par of the stock, paid
or liable to be called for as provided in that section."

That probability would seem to be increased when it is

seen that as to railroads and limited partnerships, express
provisions are made for contributions in property.    Art.
11, Sec. 13, Cons.; Ch. 114, Sec. 22 and Ch. 84, Secs. 2 and 7,
R. S.

Without denying that payment for stock might be made
in property, we held in Thayer v. El Plomo Mining Co., 40
Ill. App. 344, that as to creditors it was payment only to
the extent of the value of the property; and that "no
fiction, however innocently adopted among themselves (the
stockholders) is a defense against creditors."    Disquisitions
upon questions of fraud and trust, upon the knowledge
creditors had of the terms upon which stock had been
issued, or as to what they relied upon for payment, do not
seem pertinent to the question whether creditors are en-
titled to an enforcement of the simple and unambiguous
words in Sec. 25, Ch. 32, that "each stockholder may be
required to pay his *pro rata* share of such debts or liabili-
ties to the extent of the unpaid portion of his stock, after
exhausting the assets of such corporation."

In the case last cited, we regard the words "unpaid por-
tion," as having reference to an actual, not constructive,
fact; an equivalent in value was payment; anything short
of an equivalent in value was payment; and so we directed
that "an account should be taken, and the ratio of payment
ascertained."

And in Alling v. Wenzell, 27 Ill. App. 511, we held that
stockholders from whom the corporation had accepted prop-
erty in payment, were, in stating an account, entitled to
credit for the value of the property; but without any state-
ment of how that value was to be ascertained, or as of what
date.

The appellants here are creditors of the Pacific Railway
Company, an Illinois corporation, but not a railroad cor-
poration under the laws of this State, notwithstanding its
name.    It was organized in this State solely for purposes
stated in a circular as follows:

"Important to Shareholders in the Los Angeles Cable Railway Company.

Chicago, Ill., August 15, 1889.

Dear Sir: Every shareholder in any corporation organized under the laws of California is responsible for a *pro rata* proportion of all indebtedness incurred by the corporation during the time that he is a stockholder of record therein; nor is the obligation relieved by the sale and transfer of the stock, but he remains during the life of the corporation, personally liable for such a proportion of the indebtedness incurred while he was a shareholder, as the amount of his stock bears to the entire capital stock of the corporation. California is the only State in the Union which has such a peculiar law.

At a meeting of gentlemen who are stockholders in the Los Angeles Cable Railway Company, and representing a large majority in the stock of that company, held at the Grand Pacific Hotel in this city, on the 5th inst., the matter was thoroughly discussed, and it was unanimously resolved that a corporation be organized under the laws of the State of Illinois, with $2,500,000 of capital stock, being the same amount of the capital stock of the Los Angeles Cable Railway Company, and that all holders of shares in the latter company be requested to exchange their shares for an equal number in the Illinois corporation.

The capital stock of the latter company will be full paid, inasmuch as it holds as its assets the capital stock of the Los Angeles Cable Railway Company, turned into it at the agreed price of $2,500,000. In this way the Illinois company, as a corporation, becomes responsible under the laws of California, and not the individual holders of the Los Angeles stock, and the individual shareholders will, in this way, be relieved of personal liability, which, though it may be regarded by some as remote, does, nevertheless, exist, and in case many years from now, after the present stockholders have disposed of their holdings, the road shall fall into incompetent hands, or into the ownership of those who might not properly guard its indebtedness, the tangible property of

the company might be sold for a much less amount than would cover its bonded indebtedness, and in that case, the present shareholders would be personally responsible for their *pro rata* amount of such deficiency. It is proposed to pay off out of the proceeds from the sale of bonds of the new company, hereinafter described, all indebtedness for construction and equipment, leaving absolutely no liability, actual or prospective, resting upon the stockholders who exchange their stock, as suggested above.

Another difficulty has also been encountered, namely: When the trust deed was issued by the former owners of the road it was believed that $1,500,000, the limit of said trust deed, would be sufficient to construct the twenty miles of cable road which is now almost finished; but the actual cost of such construction will be about $2,000,000, and in a city which has grown from 10,000 people eight years ago to some 88,000 people at the present time, it is almost certain that additional cars, and probably extensions of lines, will be required in the near future, and no provisions whatever was made for this under the trust deed heretofore issued; consequently, at the meeting held on the 5th inst. it was the unanimous opinion of the gentlemen present that when the new corporation should be organized an issue of $2,500,000 of bonds should be provided for, secured by suitable trust deed; $836,000 of these bonds not to be issued by the trustee, except for the purpose of taking up and canceling an equal amount of the bonds of the Los Angeles Cable Railway Company, that amount being all of the bonds of that company which have been sold, and that after reserving the said $836,000 in the hands of the trustee, bonds be issued for an amount sufficient to pay the cost of constructing the cable road and properly equipping, it, and the balance of the bonds, amounting in round numbers to $500,000, be not issued, except at such times and in such amounts as in the judgment of the board of directors of the new company shall be necessary to meet the payment of such additional equipment and extensions as the interest of the new company shall render desirable.

It is believed that every shareholder of the Los Angeles Cable Railway Company will see that it is for his interest to join with the majority in carrying out this arrangement, as by so doing he retains precisely the same relation to the property that he now does—he does not lose anything whatever, but is at the same time relieved of personal liability in the premises. If any shareholder does not see it to be for his interest to join in this arrangement, the only method of paying the present floating indebtedness, which, upon the completion of the construction now in hand, on or about the first day of September, will reach the sum of $1,200,000, will be to follow the method prescribed by the laws of California, namely, to assess the stock a sufficient amount to pay the indebtedness. This assessment will be paid by the new corporation for all those persons who shall have exchanged their stock for stock in the Illinois corporation, and persons holding stock in the Los Angeles Cable Railway Company, and not exchanged for stock in the Illinois company, will be obliged to pay the assessment on their stock, or the same will be sold to pay said assessment, according to the statute in such cases made and provided.

In pursuance of the recommendation made at the meeting as indicated above, a new corporation has been organized under the laws of the State of Illinois, entitled "The Pacific Railway Company," with the following named persons as directors for the first year, viz.: John J. Mitchell, Morton B. Hull, Alexander Geddes, James L. Houghteling and Charles B. Holmes.

In this connection it may be of interest to add that the construction has been pushed with great energy, and the entire plant will be finished about the first of September, and it is fully believed that the expectations entertained of the property from the beginning (that the earnings after paying all operating expenses and interest charges, will be sufficient to pay handsome dividends) will be realized.

The first section of cable line, extending from Grand avenue and 7th street to the center of the city, was opened on the 8th day of June last, and has operated continuously

ever since without a single moment's delay, and without requiring any change to be made in machinery or other parts of the plant. The second section, running from the center of the city to Boyle Heights, was opened to the public on the third day of the present month, and is operating with equal satisfaction. The balance of the road, including the extensions, are almost completed, and will be in the very best condition to take care of the vast volume of travel which it is believed the road will secure, not only from the present residents of Los Angeles, but from the multitude of visitors who will make that city their winter home.

If the plan outlined above meets your approval, you are requested to forward to the undersigned, at your earliest convenience, the certificates of stock held by you in the Los Angeles Cable Railway Company, indorsed in blank on the back, and upon receipt of the same there will be forwarded to you certificates of stock in the new corporation for the same number of shares as was surrendered by you in the old. If any point in the foregoing statement is not made sufficiently clear we shall be most happy to answer any inquiries you may be pleased to make.

Respectfully yours,

C. B. HOLMES,

President Los Angeles Cable Ry. Co., 2020 State street, Chicago, Illinois.

We concur in the foregoing :

JOHN J. MITCHELL,<br>
JAMES L. HOUGHTELING,<br>
MORTON B. HULL,<br>
ALEXANDER GEDDES,<br>
CHAS. B. HOLMES,<br>
Directors Pacific Railway Company."

The scheme described in that circular was carried out, and the appellees here—other than the company itself—are stockholders, either as original, taking stock upon the terms stated in the circular, or as assignees of such.

This bill was filed by the appellants to obtain from the

stockholders satisfaction of the debts due to the appellant from the company. The company has no assets, the property, which was of the Los Angeles Cable Railway Company, having been all exhausted by prior claims. We shall not consider the question of *ultra vires*, though it is elaborately argued. On the stock of the cable company thirty-two per cent had been paid before the organization of the appellee company, and that is all that ever has been paid on the stock of either company.

The cause was referred to a master—as copied from the abstract—*inter alia* "to inquire, take proof and report the number of shares of capital stock of Pacific Railway Company held by defendants, or either of them, at and prior to filing a bill of complaint; also time and date at which certificates of stock were issued by Pacific Railway Company to above defendants, or either of them, and what consideration, if any, defendants respectively paid therefor; also what amount, if any, of the number of said certificates or shares remained unpaid at date of filing of said bill."

The master reported upon that subject—in part—as follows:

" As regards the actual value of the property and rights of the Los Angeles Cable Railway, at the time of the sale to the Pacific Railway Company, there is no evidence, except the price paid for the stock of the cable railway. I do not regard the price paid as the actual value at the time of the conveyance to the Pacific Railway Company; additional licenses had been obtained from the city, and a large amount of work had been done to improve the system in various ways. I think it would be difficult to find two men who would place the same value on the road. I think the value placed on such a property would vary, just in proportion to the favor the person had for horse railroads. I think most men would ask what the road could earn, and determine its value from the net earnings. I think the income of the electric and cable roads in 1894, as shown by the evidence, justified the parties in believing the cable road to have been worth two millions and a half, but the item which no one

considered and which could not have been foreseen (the California legislature), ruined the property.

Under such facts and circumstances I do not think the stockholders of the Pacific Railway Company owe anything on account of their stock to any of the creditors in this suit; in other words, I do not think the stockholders are liable for any further payment on their stock to the creditors in this suit. The creditors were given all the information they asked for; there is nothing in the evidence which shows that any creditor asked for any information which was not given him or that any facts were misstated to him; and further he knew where the property was, and he was at entire liberty to make any examination he pleased. I can see no reason why they could not have ascertained the actual value of the property of the Pacific Railway Company.

Briefly, I find that the consideration which the defendants, to whom the stock of the Pacific Railway Company was originally issued, paid for the same, was all the stock of the Los Angeles Cable Railway Company, and all the property, assets and rights of the said Los Angeles Cable Railway Company; that all of said creditors of the Pacific Railway Company at the time they first gave credit to the Pacific Railway Company, either knew that the stock of the Pacific Railway Company had been issued or was to be issued as full paid stock in payment for the stock of the Los Angeles Cable Railway Company, and the conveyance and transfer to it of the property and assets of said Los Angeles Cable Railway Company, and that there was no further liability on the part of the persons to whom such stock was issued to pay anything thereon; or are not in a position to claim in this case that any of the defendant stockholders are liable to pay anything further on the stock held by them respectively; that none of the said creditors in fact placed any reliance on the professed capital of the Pacific Railway Company, or extended credit to the said company, from the belief that its stock was fully paid, or that there was any liability on the part of any of the stockholders to pay anything further for their stock; that all the stock of

the Pacific Railway Company was fully paid by the property given to the company therefor, as hereinbefore stated, and that there was no fraud or fraudulent intent in the transaction by which said stock was made fully paid as aforesaid."

Upon that report the Circuit Court dismissed the bill, and this appeal followed.  That the company owes about a million and a quarter, besides interest, is an established fact in the case; that the creditors, or most of them, will never get a cent unless through this suit, is certain.

Subsequent events—other than the enforcement of the prior claims against the cable company—and which only omniscience could foresee, have made the stock of the cable company valueless.

That the stock of the cable company, upon which thirty-two per cent had been paid, and the holders of which were in fear of personal liability, as the circular shows, could have been believed by discreet, prudent business men to have been actually intrinsically worth par, is an unwarrantable conclusion.  The legal conclusions of the master concurred in by the court, are erroneous.  Such general incorporation acts as were in force in this State before the revision of 1872, would have permitted no such issue of stock.

The act of 1849, in section 14, provided that "nothing but money shall be considered as payment of· any part of the capital stock."  The act of 1852, in section 3, provided that the directors might "call in and demand from the stockholders, respectively, all such sums of money by them subscribed," etc.

The act of 1857, in section 12, provided that "nothing but money shall be considered as payment of any part of the capital stock  *  *  *  except real estate and personal property, necessary to carry on the business  *  *  *  received as payment only at a cash valuation," and carefully prescribing a method of appraisement.

The constitution of 1870, in article 11, shows the jealousy of the convention that framed it, of corporations.

The policy of the State, so far as is shown by its public

acts for twenty-three years before the revision of 1872, was clear that stock of corporations should be on the basis of real values, and not imaginary or constructive, and untrue values.

We are not prepared to decide that stock can be paid for only in money, but do decide that if the payment be in something else, it is payment only to the extent of the value of that something at the time such payment is made.

What difference is there in principle between issuing full paid stock for a percentage of the par in cash, and issuing it for property worth only a percentage of the par? Are not stockholders of the latter class, as well as of the former, within the rule that "they will be adjudged contributories, unless it shall appear they have given for such stock the equivalent in money or in money's worth?" Union Ins. Co. v. Frear Stone Mfg. Co., 97 Ill. 537.

And as they are to "be adjudged contributories unless it shall appear they have given," etc., it follows that the burden is upon them of making the fact of "money or money's worth" appear.

The decree will be reversed and the cause remanded for the purpose of an account of the debts of the company, and of the stockholders' liabilities on the basis that they are liable to the extent of their several holdings—if necessary to pay the debts of the company—less only what it shall be made to appear was, at the time they or their assignors, immediate or remote, took the stock, the fair actual value of what was given as payment for the stock. Reversed and remanded.

MR. JUSTICE SHEPARD.

I concur with the presiding justice in his conclusion, but upon somewhat different reasoning, which, however, I will not take time to elaborate.

MR. JUSTICE WATERMAN DISSENTING.

The capital stock of a corporation is a trust fund. With reference to payments of subscriptions for stock, the rule in this State as laid down in Coleman v. Howe, 154 Ill. 458–467, is as follows:

"If a stockholder has not paid his subscription in full he is liable for the debts of the corporation to the extent of the unpaid portion of his subscription. It is the duty of the directors of a corporation to manage its capital stock as a trust fund for the benefit of its shareholders while it exists, and of its creditors in case of its dissolution. This trust fund consists not only of the capital paid in, but also of that which the shareholder has promised to pay in. The unpaid stock is as much a part of the corporate assets, as the money which has been paid upon the stock. The obligation of a subscriber to pay his subscription can not be released or surrendered to him by the trustees of the corporation. Nor will stockholders be permitted to agree among themselves, that their shares shall be taken at a nominal value, or be non-assessable, when such agreement operates to the injury of creditors. Upton v. Tribilcock, 91 U. S. 45; Sanger v. Upton, 91 Id. 56. 'Any device by which the members of a corporation seek to avoid the liability which the law imposes upon them is void as to creditors, whether binding or not as between themselves. Of this character is an agreement among the members that the shares of the capital stock of the corporation shall be regarded as fully paid up,' when, in fact, they are not fully paid. Union Ins. Co. v. Frear Stone Mfg. Co., 97 Ill. 537. The question presents itself in this case, whether the stock held by the appellants was stock which had been in good faith fully paid up, or whether it must be regarded as stock upon which fifty per cent remained unpaid, as a fund liable to be subjected by the appellees to the payment of their judgments.

It is held, that stock may be paid for in property as well as in money. 2 Morawetz on Priv. Corp., Sec. 825; 23 Am. & Eng. Enc. of Law, page 794. In the present case, the capital stock was paid for in property alone. Property worth not more than $75,000 was conveyed in exchange for capital stock amounting to $300,000. There was here an over-valuation of the property which formed the consideration for the issue of the stock. Cases may arise where stock is issued for property taken at an over-valuation, which will

justify the courts in compelling the stockholders to respond to the creditors for the par value of the stock, less the actual value of the property taken in exchange for it. Such will not be the case where there is entire good faith in making the valuation. But if the property contributed is not valued in good faith, the shares of stock will not be fully paid up, either in law or fact, by the contribution of such property. A declaration by the corporation that the shares are paid up will not avail against the creditors in case of insolvency. 2 Morawetz on Priv. Corp., Sec. 825. 'The courts have inflexibly enforced the rule that payment of stock subscriptions is good as against creditors only where payment has been made in money, or what may be fairly considered as money's worth.' Wetherbee v. Baker, 35 N. J. Ex. 501.

Some of the cases hold that over-valuation will not render the stockholder liable for the difference between the actual and accepted values unless there is affirmative proof for fraud *aliunde*. But other cases hold what we regard as the better view, namely, that where property, whose value is well known or can be easily learned, is taken at an exaggerated estimate, a strong presumption is raised that the valuation is not in good faith and is made for a fraudulent purpose. This presumption will be conclusive unless rebutted by satisfactory evidence explanatory of the apparent fraud. Where the over-valuation is so great that the fraudulent intent appears on its face, and is not explained, the court will hold it to be fraudulent as a matter of law. 1 Cook on Stock, etc., Sec. 47; 23 Am. & Eng. Enc. of Law, pages 859, 860; Douglas v. Ireland, 73 N. Y. 104; Boynton v. Andrews, 63 Id. 93; Boynton v. Hatch, 47 Id. 232; Osgood v. King, 42 Iowa, 478. In Boynton v. Andrews, *supra*, stock for $100,000 was issued 'for property worth $50,000, and it was held that there was a gross over-valuation, and that the transaction was fraudulent in law on its face."

From this it follows that when, as between a corporation and a subscriber for its stock, the subscription has been paid in full, a creditor who attacks such payment, insisting that

the subscription has not in good faith been fully paid, and that he, as a creditor of the corporation, is entitled to recover the unpaid amount subscribed, is bound to show that the apparent or agreed payment as between the corporation and the subscriber, was fraudulent; consequently the burden of proof to show fraud is upon the creditor.

This cause was, on November 24, 1891, referred to the master by the following order :

"It appearing that this cause is at issue as to defendants J. G. McWilliams, Allison V. Armour, E. T. Cushing, E. Foote, Jr., George A. Armour and Allison V. Armour, trustees for Mary G. Armour, Barbara Armour, L. L. Coburn, C. H. Morse, O. S. Swan, E. G. Hamilton, M. A. Ryerson, D. F. Morgan, M. A. Bellas, John S. Kirk, Simon Florsheim, Chas. B. White, Wm. F. Morgan and D. Percy Morgan, trustees for L. H. and C. F. Morgan, James C. King, John B. Kirk, J. J. Mitchell, James Houghteling, John C. Grant, Edward T. Cushing, W. W. Farnam, Mrs. Alice M. Farnam, C. B. Coy, E. F. Spence, S. C. Hubbell, E. F. Hurlbut, J. F. Crank, I. W. Hellman, William Alvord, Louise Smith, F. O. Weeks, Mrs. W. S. Hawk, A. B. Chapman, and C. C. Cuyler, on motion of complainant's solicitors it is ordered that said cause, as to the defendants above named, be referred to I. K. Boyesen, master in chancery, for proof, and said master is hereby directed to inquire, take proof and report the number of shares of capital stock of Pacific Railway Company held by defendants, or either of them, at and prior to the filing of the bill of complaint herein; also the time or date at which said certificates of shares of stock were issued by said defendant, the Pacific Railway Company, to the above named defendants, or either of them, and what consideration, if any, the said defendants respectively paid therefor; also what amount, if any, of the principal sum of said certificates or shares remained unpaid at the date of filing said bill of complaint; and the said master is further directed to ascertain, take proof and report all sums of money due complainant and intervening petitioners in said case, and other creditors of the Pacific Railway Com-

pany similarly situated, who may become parties complainant by intervention or otherwise; all of which evidence the said master is directed to report to this court, together with his findings thereon."

On December 24, 1891, a similar order in respect to defendants W. S. Hawk et al., was made, and on December 31, 1891, a similar order as to M. E. Dayton, defendant, was entered.

On the 26th day of June, 1893, it was ordered that the references herein be transferred to George Bass, Esq., and that the testimony already taken stand.

It is insisted by counsel for appellant that the references to the master were not references of the issues of the case at all, but merely references upon certain questions upon which the master was to take evidence and state the facts, not the law.

As to what consideration, if any, the defendants respectively paid for the certificates of stock of the Pacific Railway Company to them severally issued, the master was directed to inquire, take proof and report, and also what amount, if any, of the number of said certificates or shares remained unpaid at the date of the filing of the bill in this cause.

Counsel for appellants further say that there was a final hearing of the case before the chancellor, upon which evidence was heard without objection, in fact, upon an express mutual understanding as to the nature of the several references; that the master made up a report as if upon a full reference, but objections and exceptions upon its consideration as such were filed, and that there was a hearing of the cause before the court, and that this hearing and trial by the court was upon evidence introduced before it and depositions filed in the case, and the evidence taken before the master.

When a cause is referred to a master to take testimony and report his findings thereon, if the evidence before him consists in whole or in part of the testimony of witnesses who personally appear before him and testify in his presence, his report goes to the chancellor with the force and effect of the verdict of a jury.

In the present case, some of the testimony taken by the master was by way of depositions, and some was that of witnesses who personally testified before him.

It was the duty of the master, under the references, to report his conclusion as to the consideration, if any, paid by the holders of certificates of the Pacific Railway Company stock, and also the amount, if any, due from such holders; and so he did. The court, it would seem, upon consideration of all the evidence reported by the master, and also of some heard by the court, came to the same conclusion in respect to the consideration paid for the certificates of the Pacific Railway stock that did the master, so that the cause comes to this court with clearly the conclusion of both the chancellor and the master that the complainant has not shown that there was any over-valuation or fraudulent dealing in respect to the payment for the certificates of stock issued by the Pacific Railway Company.

If it could be said that at the time the certificates of stock were issued by the Pacific Railway Company, the value of the property given therefor was well known to have been, or might easily have been learned to have been, taken by the company at an exaggerated estimate, then a presumption would be raised that the valuation put upon the property received by said Pacific Railway Company for such certificates was not made in good faith, but was made for a fraudulent purpose; and it is urged by appellants that such was the case, because, not long previous, such property had been sold at a rate equivalent to $32 upon the shares of the Pacific Railway Company.

If the railway property under consideration, instead of being what it was, had been a piece of ordinary real estate, or had consisted of merchandise of a kind frequently sold, and which had a well known value, the contention of appellants might be unanswerable. It is well known, however that the value of railroad property, and especially street railroad property, depends very largely upon the men in control thereof. If, in the city of Chicago at the present time, it should become known that Mr. Yerkes had sold all of his

holdings in certain street railroad property, while in a cer-tain sense it might be said that it would not affect the in-trinsic value, it would very seriously affect the market value, and might in various ways affect the earning or dividend-paying capacity of such property. So, in the present case, it is apparent that the parties who purchased the Los An-geles railway lines did not do so with any thought of let-ting them remain in the condition they found them, but contemplated enlarging and extending them, thus increasing the intrinsic value and their dividend-paying capacity. And it appears that, after making such purchase of the Los Angeles lines, they proceeded to obtain additional licenses from the city of Los Angeles, and did a large amount of work in the improvement of the railroad system. What the value of such licenses at the time of the issuing of the certificates of stock by the Pacific Railway Company was, and to what extent the value of the Los Angeles property had by such licenses and by the work and improvements done thereon, been increased, there is nothing to show.

It appears to me that, with the burden resting upon ap-pellants to show that the property received by the Pacific Railway Company for which its certificates of stock were given, was fraudulently received at an excessive and well known over-valuation, appellants should have shown what its value was at the time such certificates were issued, and that it was not sufficient for them to show that at some time previous a purchase thereof had been made at a certain price, and to pay no attention to what additional value had been imparted thereto by the change of management and ownership, by the additional licenses obtained from the city of Los Angeles, and by the improvements made upon such railway system.

The mere cost of a street railway is often but little indi-cation of its value. The street railways of Chicago are probably to-day worth at least five times the actual cost thereof.

In respect to the acceptance of this railway property in payment for the stock of the Pacific Company, if it was fraud-

ulently received, there is absent from the transaction that concealment which almost always accompanies fraud; indeed, it may be said that actual fraud, distinguishing it from constructive fraud, is always accompanied by deception.   Misrepresentation is of the very essence of actual fraud.   An action for deceit can not be maintained by one who has not been deceived, whatever misrepresentations may have been made to him.   If a man represented that his house was three stories high, and the vendee before purchasing goes over the house and plainly sees that it is but one story in height, he can not recover damages for such misrepresentation made by the vendor to him.

All that was done in respect to payment for stock issued by the Pacific Railway Company was open and above board. · Every one who dealt with the company seems to have known in just what way and manner its stock had been paid for.

The report of the master upon this subject is as follows:

" When the seventeen thousand and odd shares of stock of the Cable Railway Company were purchased by gentlemen here in Chicago, a committee was sent to Los Angeles, California; Mr. Holmes was on that committee, and was the only one of the committee whom the evidence shows to have been an experienced horse railroad man.   I think the general inference is, from the evidence, that the stockholders were influenced by the recommendations and judgment of Mr. Holmes; and when the bonds were negotiated it would seem from the testimony that some of the bondholders relied entirely upon the judgment of Mr. Holmes in taking the bonds as security for the company's notes. The statement of Mr. Holmes that the bonds were good security was sufficient for many of the bondholders, while others wanted in addition to that that he should indorse the notes.   I think that the evidence shows plainly that had it not been for the fact of the paralleling of the tracks of the Pacific Railway Company, by the Electric Railway Company, that the Pacific Railway Company would be a paying investment.   The evidence shows the earnings of the

two roads, for a portion of 1894, exceed the earnings which Mr. Holmes' representations called for. The evidence also shows that the Cable Railway Company would do ninety-five per cent of the business now done by the Electric Railway Company if the latter company was not there.

As regards the actual value of the property and rights of the Los Angeles Cable Railway at the time of the sale to the Pacific Railway Company, there is no evidence, except the price paid for the stock of the Cable Railway. I do not regard the price paid as the actual value at the time of the conveyance to the Pacific Railway Company; additional licenses had been obtained from the city, and a large amount of work had been done to improve the system, in various ways. I think it would be difficult to find two men who would place the same value on the road. I think the value placed on such property would vary, just in proportion to the favor the person had for horse railroads. I think most men would ask what the road could earn, and determine its value from the net earnings. I think the income of the electric and cable roads in 1894, as shown by the evidence, justifies the parties in believing the cable road to have been worth two millions and a half, but the item which no one considered and could not have been foreseen (the California legislature), ruined the property.

Under such facts and circumstances I do not think the stockholders of the Pacific Railway Company owe anything on account of their stock to any of the creditors in this suit; in other words, I do not think the stockholders are liable for any further payment on their stock to the creditors in this suit. The creditors were given all the information they asked for; there is nothing in the evidence which shows that any creditor asked for any information which was not given him, or that any facts were misstated to him, and further, he knew where the property was; and he was at entire liberty to make any examination he pleased. I can see no reason why they could not have ascertained the actual value of the property of the Pacific Railway Company.

Briefly, I find that the consideration which the defendant,

to which the stock of the Pacific Railway Company was originally issued, paid for the same, was all the stock of the Los Angeles Cable Railway Company, and all the property, assets and rights of the said Los Angeles Cable Railway Company.

That all of said creditors of the Pacific Railway Company, at the time they first gave credit to the Pacific Railway Company, either knew that the stock of the Pacific Railway Company had been issued or was to be issued as full paid stock in payment for the stock of the Los Angeles Cable Railway Company, and the conveyance and transfer to it of the property and assets of said Los Angeles Cable Railway Company, and that there was no further liability on the part of the persons to whom such stock was issued to pay anything thereon; or are not in a position to claim in this case, that any of the defendant stockholders are liable to pay anything further on the stock held by them respectively.

That none of the said creditors in fact placed any reliance on the professed capital of the Pacific Railway Company or extended credit to the said company from the belief that its stock was fully paid, or that there was any liability on the part of any of the stockholders to pay anything further for their stock.

That all the stock of the Pacific Railway Company was fully paid by the property given to the company therefor, as hereinbefore stated, and that there was no fraud or fraudulent intent in the transaction by which said stock was made full paid as aforesaid." Reversed and remanded.